ORIGINAL

1    Randall Allen (State Bar No. 264067)
     **ALSTON + BIRD LLP**
2    Two Palo Alto Square
     3000 El Camino Real, Suite 400
3    Palo Alto, California  94306
     Telephone: 650-838-2000
4    Facsimile:  650-838-2001
     Email:  randall.allen@alston.com
5
     Peter Kontio (peter.kontio@alston.com)**
6    Valarie C. Williams (valarie.williams@alston.com)**
     B. Parker Miller (parker.miller@alston.com)**
7    **ALSTON + BIRD LLP**
     1201 West Peachtree Street
8    Atlanta, Georgia 30309
     Telephone:  404-881-7000
9    Facsimile:  404-881-7777
     **\*\*Pending Pro Hac Vice Admission*
10
     Richard W. Stimson (rick.stimson@alston.com) **
11   **ALSTON + BIRD LLP**
     Chase Tower, Suite 3601
12   2200 Ross Avenue
     Dallas, Texas 75201
13   Telephone: 214-922-3400
     Facsimile: 214-922-3899
14   **\*\*Pending Pro Hac Vice Admission*

15   ***Attorneys for Plaintiffs Nokia Corporation and Nokia Inc.***

16

17                **UNITED STATES DISTRICT COURT**
18          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
19
20                                              *CV* 09   5609
     NOKIA CORPORATION and
21   NOKIA INC.,                              CASE NO: _____

22                    Plaintiffs,
                                              **COMPLAINT FOR DAMAGES**
23   v.                                       **AND INJUNCTIVE RELIEF**

24   AU OPTRONICS CORPORATION; AU
25   OPTRONICS CORPORATION               **DEMAND FOR JURY TRIAL**
     AMERICA, INC.; CHUNGHWA PICTURE
26   TUBES, LTD.; TATUNG COMPANY;
     TATUNG COMPANY OF AMERICA, INC.;
27   SEIKO EPSON CORPORATION; EPSON
     IMAGING DEVICES CORPORATION;
28   EPSON ELECTRONICS AMERICA, INC.;

     COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF        1

FILED

NOV 2 5 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EDL

HITACHI, LTD.; HITACHI DISPLAYS,
1 | LTD.; HITACHI ELECTRONIC DEVICES
(USA), INC.; LG DISPLAY CO. LTD.; LG
2 | DISPLAY AMERICA, INC.; PHILIPS
ELECTRONICS NORTH AMERICA
3 | CORPORATION; SAMSUNG
ELECTRONICS CO., LTD.; SAMSUNG
4 | SEMICONDUCTOR, INC.; SAMSUNG
ELECTRONICS AMERICA, INC.;
5 | SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SHARP CORPORATION;
6 | SHARP ELECTRONICS CORPORATION;
TOSHIBA CORPORATION; TOSHIBA
7 | AMERICA ELECTRONIC COMPONENTS,
INC.; TOSHIBA MOBILE DISPLAY CO.,
8 | LTD.; and TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.,

9

               Defendants.

10

11

12        Plaintiffs Nokia Corporation and Nokia Inc., for their Complaint against Defendants AU

13 Optronics Corporation; AU Optronics Corporation America, Inc.; Chunghwa Picture Tubes, Ltd.;

14 Tatung Company; Tatung Company of America, Inc.; Seiko Epson Corporation; Epson Imaging

15 Devices Corporation; Epson Electronics America, Inc.; Hitachi Ltd.; Hitachi Displays, Ltd.; Hitachi

16 Electronic Devices (USA), Inc.; LG Display Co., Ltd.; LG Display America, Inc.; Philips Electronics

17 North America Corporation; Samsung Electronics Co., Ltd.; Samsung Semiconductor, Inc.; Samsung

18 Electronics America, Inc.; Samsung SDI Co., Ltd.; Samsung SDI America, Inc.; Sharp Corporation;

19 Sharp Electronics Corporation; Toshiba Corporation; Toshiba America Electronics Components, Inc.;

20 Toshiba Mobile Display Co., Ltd.; and Toshiba America Information Systems, Inc. (collectively

21 "Defendants"), hereby allege as follows:

22     **A.**    **INTRODUCTION**

23     1.    Nokia Corporation and Nokia Inc. bring this action on behalf of themselves and their

24 respective subsidiaries, assigns, affiliates, or related companies (collectively and/or individually

25 "Nokia") to recover damages incurred as a result of a long-running conspiracy by suppliers of liquid

26 crystal displays ("LCDs").

27     2.    From at least January 1, 1996 through at least December 11, 2006 ("the Conspiracy

28 Period"), Defendants and their co-conspirators conspired with the purpose and effect of fixing,

1  raising, stabilizing, and maintaining prices for LCDs. Defendants and their co-conspirators sold

2  LCDs at unlawfully inflated prices to Nokia in the United States and elsewhere.

3      3.    By communications and meetings in which Defendants agreed to eliminate

4  competition and fix prices for LCDs, Defendants and their co-conspirators illegally restricted

5  competition in the LCD market in the United States and elsewhere. During the Conspiracy Period,

6  the conspiracy affected billions of dollars of the interstate and foreign commerce of the United States.

7      4.    Five of the Defendants have pleaded guilty to participating in the conspiracy to fix the

8  prices of LCDs in an ongoing criminal investigation by the United States Department of Justice

9  ("DOJ"): Chunghwa Picture Tubes, Ltd.; Sharp Corporation; LG Display Co., Ltd.; Hitachi Displays,

10  Ltd.; and Epson Imaging Devices Corporation. On or about November 10, 2008, Chunghwa Picture

11  Tubes, Ltd. agreed to plead guilty and pay a $65 million criminal fine for its role in the conspiracy to

12  fix the price of LCDs. On or about November 11, 2008, Sharp Corporation agreed to plead guilty

13  and pay a $120 million criminal fine for its role in the conspiracy to fix the price of LCDs. On or

14  about November 12, 2008, LG Display Co., Ltd. agreed to plead guilty and pay a $400 million

15  criminal fine for its role in the conspiracy to fix the price of LCDs. On or about March 5, 2009,

16  Hitachi Displays, Ltd. agreed to plead guilty and pay a $31 million criminal fine for its role in the

17  conspiracy to fix the price of LCDs. On or about August 25, 2009, Epson Imaging Devices

18  Corporation agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy to

19  fix the price of LCDs.

20      5.    Defendants' and their co-conspirators' illegal conspiracy raised the price of LCDs

21  above the price that would have prevailed in a competitive market. During the Conspiracy Period,

22  Nokia purchased LCDs in the interstate and foreign commerce of the United States. The LCDs were

23  incorporated into Nokia mobile wireless handsets. Nokia suffered damages as a result of Defendants'

24  and their co-conspirators' conspiracy and is entitled to treble damages and injunctive relief to remedy

25  these injuries.

26      6.    Nokia brings this action seeking federal injunctive relief under Section 16 of the

27  Clayton Act, 15 U.S.C. § 26, and for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28  Nokia also seeks to recover damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and the

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    3

1  California Cartwright Act, Cal. Bus & Prof. Code §§ 16700 *et seq*., as well as other state antitrust and

2  unfair competition laws. Nokia also seeks to recover the costs of suit, including reasonable attorneys'

3  fees. These damages, costs, and fees are for the injuries that Nokia suffered as a result of

4  Defendants' and their co-conspirators' conspiracy to fix, raise, maintain, and stabilize the prices of

5  LCDs.

### B. JURISDICTION AND VENUE

7      7.      Nokia brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and

8  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain treble damages and

9  injunctive relief against all Defendants.

10      8.      Nokia also brings this action pursuant to the Cartwright Act, California Bus. & Prof.

11  Code § 16750(a), for injunctive relief and treble damages that Nokia sustained due to Defendants'

12  and their co-conspirators' illegal price-fixing conspiracy, and pursuant to the California Unfair

13  Competition Law, Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from and an

14  injunction against Defendants due to their unlawful and fraudulent business acts and practices.

15      9.      Nokia further brings this action to obtain restitution under various other state antitrust

16  and unfair competition laws, including those in Arizona, the District of Columbia, Florida, Hawaii,

17  Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico,

18  New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and

19  Wisconsin.

20      10.      Defendants engaged in conspiratorial conduct both within and outside the United

21  States, with Defendants' conduct in the United States centered in California. In their respective plea

22  agreements, Defendants Chunghwa Picture Tubes, Ltd.; LG Display Co., Ltd. (and its wholly-owned

23  subsidiary, LG Display America, Inc.); Sharp Corporation; Hitachi Displays, Ltd., and Epson

24  Imaging Devices Corporation each admitted that "[a]cts in furtherance of this conspiracy were carried

25  out within the Northern District of California. TFT-LCD affected by this conspiracy was sold by one

26  or more of the conspirators to customers in this District." Defendant LG Display America, Inc.,

27  which admitted to participating in the conspiracy, maintains its principal place of business in San

28  Jose, California. Similarly, Defendants Chunghwa Picture Tubes, Ltd. and Epson Imaging Devices

Corporation, which also admitted to participating in the conspiracy, used California corporations with principal places of business in Long Beach and San Jose, California, (Defendants Tatung Company of America, Inc. and Epson Electronics America, Inc., respectively) as their sales agents in the United States for LCDs that were affected by the conspiracy. Many of the other Defendants also maintained offices and operations in California during the Conspiracy Period, including AU Optronics Corporation America, Inc.; Hitachi Electronic Devices (USA), Inc.; Samsung Semiconductor, Inc.; Samsung SDI America, Inc.; Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc. Communications in furtherance of the conspiracy occurred within California and between California and other states.

11. Nokia also brings this action pursuant to the Cartwright Act and the California Unfair Competition Law, or in the alternative, the antitrust and/or unfair competition laws of Arizona, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin. As a nationwide business with operations in all of these states during the relevant period, Nokia is entitled to the protection of the antitrust and unfair competition laws of each of the above-mentioned states.

12. Pursuant to 28 U.S.C. §§ 1331 and 1337, the Court has jurisdiction over Nokia's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

13. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Nokia's claims under the Cartwright Act, California Bus. & Prof. Code §§ 16700 *et seq.*, and the California Unfair Competition Law, California Bus. & Prof. Code §§ 17200 *et seq*. This Court also has supplemental jurisdiction over Nokia's claims under the state antitrust and unfair competition laws set forth below. These state law claims are related to Nokia's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act in that they form part of the same case or controversy.

14. Nokia brings this action to recover damages for the following purchases during the Conspiracy Period of LCDs and LCD Products that were shipped to Nokia in the United States from Defendants located in the United States or abroad.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF          5

15. Nokia Inc. transported a certain portion of the LCDs that were originally shipped to Nokia Inc. in the United States to Nokia Mexico, S.A. de C.V. ("Nokia Mexico"). Nokia Mexico assembled these LCDs, as well as other components, into finished mobile wireless handsets that were returned to the United States for sale by Nokia Inc.

16. The activities of Defendants and their co-conspirators, as described herein, targeted and involved United States import trade or import commerce. This conduct was intended to — and did in fact — have a substantial effect on United States commerce.

17. To the extent applicable, jurisdiction exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, in that Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effect gave rise to Nokia's claims alleged herein.

18. The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in Arizona, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin. These effects also give rise to Nokia's antitrust claims. Nokia Inc. sold products to customers and/or maintained operations in these states during the Conspiracy Period.

19. This court has jurisdiction over each defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22, and California Civ. Pro. § 410.10. Each of the Defendants and/or its subsidiaries, agents, or affiliates conduct substantial business in California, and a number of the Defendants maintain their headquarters in the Northern District of California and elsewhere in the state. In addition, Defendants and their co-conspirators purposely availed themselves of the laws of the United States and the identified states insofar as they manufactured LCDs for sale in the United States, including California and the other identified states, or which were incorporated into LCDs and LCD Products that Defendants and their co-conspirators knew would be sold to customers in the United States, including California and the other identified states. Defendants' and their co-conspirators' conspiracy affected this commerce in LCDs and LCD

1 Products in the United States and in Arizona, California, the District of Columbia, Florida, Hawaii,
2 Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico,
3 New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and
4 Wisconsin.

5   20. Venue is proper in the Northern District of California under Section 12 of the Clayton
6 Act, 15 U.S.C. § 22, because each defendant is either an alien corporation, transacts business in this
7 District, or is otherwise found within this District. In addition, venue is proper in this District under
8 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim
9 occurred in this District. Defendants and their co-conspirators knew that price-fixed LCDs and LCD
10 Products containing price-fixed LCDs would be sold and shipped into this District.

11   21. Assignment to the San Francisco Division is appropriate under Local Rule 3-2(c),
12 N.D. Cal., because a substantial part of the events or omissions giving rise to this claim occurred in
13 this Division.

14   22. Because Nokia's action is related to the case captioned *In re TFT-LCD Antitrust*
15 *Litigation*, Case No. M:07-CV-1827-SI, this action will be assigned to the San Francisco Division,
16 Judge Susan Illston presiding. This action concerns substantially the same parties, transactions, and
17 events as Case No. M:07-CV-1827-SI insofar as it involves a suit for damages and injunctive relief
18 arising out of Defendants' conspiracy to fix the price of LCDs in violation of Section 1 of the
19 Sherman Act, 15 U.S.C. § 1, and the antitrust and unfair competition laws of California and other
20 states. Pursuant to Pretrial Order No. 1 in M:07-CV-1827-SI, this case is automatically consolidated
21 with M:07-CV-1827-SI for all pretrial proceedings without any further motion or order.

22   **C. DEFINITIONS**

23   23. "LCD" means liquid crystal display. LCDs use glass plates and a liquid crystal
24 compound to electronically display an image for applications such as the display screens of mobile
25 wireless handsets. The technology involves sandwiching a liquid crystal compound between two
26 glass plates called "substrates." The resulting screen contains hundreds or thousands of electrically
27 charged dots, or pixels, that form an image.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF   7

24. During the Conspiracy Period, LCDs used in mobile wireless handsets included at least four different types of passive and active matrix technologies: thin film transistor panels ("TFT panels"), color super-twist nematic panels ("CSTN panels"), film super-twist nematic panels ("FSTN panels"), and monochrome super-twist nematic panels ("MSTN panels"). Defendants' and their co-conspirators' price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining, and/or stabilizing the prices of LCDs using TFT, CSTN, FSTN, and MSTN technologies.

25. "LCD Product" means any product containing LCDs, including without limitation, mobile wireless handsets (including voice, data, and combination voice and data devices, or any portion thereof), computer monitors, notebook and laptop computers, and televisions.

26. As used herein, the term "OEM" means any original equipment manufacturer of an LCD Product.

27. As used herein, the term "ODM" means any original design manufacturer of an LCD Product.

28. As used herein, the term "CEM" means any contract engine manufacturer of an LCD Product.

29. As used herein, the term "Outsourced Manufacturer" or "OM" means any OEM, ODM, or CEM of an LCD Product.

### D. THE PARTIES

#### 1. Nokia

30. Nokia Corporation is a global leader in the design, manufacture, and supply of mobile wireless handsets. Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

31. Nokia Inc. is incorporated under the laws of the State of Delaware and has a principal place of business at 102 Corporate Park Drive, White Plains, New York, 10604. Nokia Inc. is a subsidiary of Nokia Corporation.

32. Throughout the Conspiracy Period, Nokia Corporation contracted with various Defendants regarding the prices and volumes of LCDs that Nokia purchased.

33. Throughout the Conspiracy Period, Nokia Corporation also contracted with various Defendants regarding the prices of LCDs to be supplied to its OMs that assembled LCD Products for delivery to Nokia.

34. Defendants' and their co-conspirators' price fixing was the proximate cause of Nokia and its affiliates paying artificially-elevated prices for LCDs and LCD Products purchased during the Conspiracy Period.

## 2. Defendants

### a. AU Optronics

35. Defendant AU Optronics Corporation is one of the largest manufacturers of LCDs. Its corporate headquarters are at No. 1, Li-Hsin Rd. 2, Hsinchu Science Park, Hsinchu 30078, Taiwan. During the Conspiracy Period, Nokia purchased LCDs from AU Optronics Corporation itself or via one of its subsidiaries. AU Optronics Corporation also manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere during the Conspiracy Period.

36. Defendant AU Optronics Corporation America, Inc. is a wholly-owned and controlled subsidiary of defendant AU Optronics Corporation. Its corporate headquarters are at 9720 Cypresswood Drive, Suite 241, Houston, Texas 77070. It also has facilities located in San Diego and Cupertino, California. During the Conspiracy Period, AU Optronics Corporation America, Inc. manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

37. Defendants AU Optronics Corporation and AU Optronics Corporation America, Inc. are sometimes referred to collectively herein as "AU Optronics." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant AU Optronics Corporation America, Inc. was a member of the conspiracy because, among other reasons, of its status during the Conspiracy Period as the alter ego or agent of AU Optronics Corporation. AU Optronics Corporation dominated or controlled AU Optronics Corporation America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

**b. Chunghwa**

38. Defendant Chunghwa Picture Tubes, Ltd. is a leading manufacturer of LCDs. Its global headquarters are at 1127 Hopin Rd., Padeh City, Taoyuan, Taiwan 334 R.O.C. The parent company of Chunghwa Picture Tubes, Ltd. is Tatung Company, which controls Chunghwa Picture Tubes, Ltd. by virtue of its shareholding in, and affiliations with, Chunghwa Picture Tubes, Ltd. Chunghwa Picture Tube, Ltd.'s Board of Directors includes representatives from Tatung Company. The Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also the Chairman and General Manager of Tatung Company. During the Conspiracy Period, Chunghwa Picture Tubes, Ltd. manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

39. Defendant Tatung Company is a consolidated consumer electronics and information technology company based in Taiwan. Its principal place of business is at 22, Sec. 3, Chung-Shan N. Rd., Taipei City 104, Taiwan. Tatung Company is the parent company of Chunghwa Picture Tubes Ltd. and Tatung Company of America, Inc. During the Conspiracy Period, Tatung Company manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

40. Defendant Tatung Company of America, Inc. ("Tatung America") is a subsidiary of Tatung Company with its principal place of business at 2850 El Presidio Street, Long Beach, California. Currently, Tatung Company owns approximately half of Tatung America. The other half is owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S. Lin. During the Conspiracy Period, Tatung America manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

41. Defendants Chunghwa Picture Tubes, Ltd., Tatung Company, and Tatung America are sometimes referred to collectively herein as "Chunghwa." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Chunghwa Picture Tubes, Ltd. and Tatung America were members of the conspiracy because, among other reasons, of their status during the Conspiracy Period as the alter egos or agents of Tatung Company. Tatung Company dominated or controlled Chunghwa Picture Tubes, Ltd. and Tatung America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

### c. Epson

42. Defendant Seiko Epson Corporation ("Seiko Epson") is a Japanese company with its principal place of business at 2-4-1, Nishi-Shinjuku-ku, Tokyo, Japan. During the Conspiracy Period, Nokia purchased LCDs from Seiko Epson itself or via its subsidiaries. Seiko Epson also manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

43. Defendant Epson Imaging Devices Corporation ("Epson Imaging") is a wholly-owned and controlled subsidiary of Seiko Epson. Its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6 104 Japan. Epson Imaging was originally formed as a joint venture between Seiko Epson and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson. Up until December 28, 2006, Epson Imaging was known as Sanyo Epson Imaging Devices Corporation. During the Conspiracy Period, Epson Imaging manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

44. Defendant Epson Electronics America, Inc. ("Epson America") is a wholly-owned and controlled subsidiary of Seiko Epson. Its principal place of business is at 2580 Orchard Parkway, San Jose, California 95131. During the Conspiracy Period, Epson America manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

45. Defendants Seiko Epson, Epson Imaging, and Epson America are sometimes referred to collectively herein as "Epson." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Epson Imaging and Epson America were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Seiko Epson. Seiko Epson dominated or controlled Epson Imaging and Epson America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

### d. Hitachi

46. Defendant Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. The company was one of the original producers of LCDs. In 2002, it spun off its LCD manufacturing assets to Hitachi Displays, Ltd., which was a wholly-owned subsidiary of Hitachi, Ltd. throughout the remainder of the

Conspiracy Period. During the Conspiracy Period, Nokia purchased LCDs from Hitachi, Ltd. itself or via its subsidiaries. Hitachi, Ltd. also manufactured, sold, and/or distributed LCDs to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

47. Defendant Hitachi Displays, Ltd. is a wholly-owned subsidiary of Hitachi, Ltd. Its principal place of business is AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was formed in 2002 and acquired Defendant Hitachi, Ltd.'s LCD manufacturing business. During the Conspiracy Period, Hitachi Displays, Ltd. manufactured, sold, and/or distributed LCDs to customers throughout the United States and elsewhere.

48. Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware corporation with its principal place of business at 575 Mauldin Road, Greenville, South Carolina 29607. Its ultimate parent company is Hitachi, Ltd. During the Conspiracy Period, Hitachi Electronic Devices (USA), Inc. sold, and/or distributed LCDs throughout the United States and elsewhere.

49. Defendants Hitachi, Ltd.; Hitachi Displays, Ltd.; and Hitachi Electronic Devices (USA), Inc. are sometimes referred to collectively herein as "Hitachi." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Hitachi Displays, Ltd. and Hitachi Electronics Devices (USA), Inc. were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Hitachi, Ltd. Hitachi, Ltd. dominated or controlled Hitachi Displays, Ltd. and Hitachi Electronics Devices (USA), Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

### e. LG Display

50. Defendant LG Display Co., Ltd., formerly known as LG Philips LCD Co., Ltd., is a leading manufacturer of LCDs. It was created in 1999 as a joint venture by Royal Philips Electronics NV and LG Electronics, Inc. LG Display Co., Ltd. has its principal place of business at 17th Floor, West Tower, LG Twin Tower, 20 Yoido-dong, Youngdungpo-gu, Seoul, 150-72 1, Republic of Korea. LG Display Co., Ltd. also maintains offices in San Jose, California. During the Conspiracy Period, LG Display Co., Ltd. manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

51. Defendant LG Display America, Inc., formerly known as LG Philips LCD America, Inc., has its principal place of business at 150 East Brokaw Rd., San Jose, California 95112. During the Conspiracy Period, LG Display America, Inc. manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

52. Defendants LG Display Co., Ltd. and LG Display America, Inc. are sometimes referred to collectively herein as "LG Display." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant LG Display America, Inc. was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of LG Display Co., Ltd. LG Display Co., Ltd. dominated or controlled LG Display America, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

### f. Philips

53. Defendant Philips Electronics North America Corporation ("Philips") is a wholly-owned subsidiary of Philips International, B.V., which in turn is a wholly-owned subsidiary of Royal Philips Electronics, N.V. Philips has its principal place of business at 3000 Minuteman Road, Andover, Massachusetts 01810. During the Conspiracy Period, Nokia purchased LCDs from Royal Philips Electronics N.V. and Philips Electronics North America Corporation themselves or via their subsidiaries. Philips Electronics North America Corporation also manufactured, sold, and/or distributed LCDs to other purchasers through the United States and elsewhere during the Conspiracy Period. Philips participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority.

### g. Samsung

54. Defendant Samsung Electronics Co., Ltd. has its principal place of business at Samsung Main Building, 250-2 ga, Taepyung-ro Chung-gu, Seoul, Republic of Korea. During the Conspiracy Period, Nokia purchased LCDs from Samsung Electronics Co., Ltd. itself or via its subsidiaries. Samsung Electronics Co., Ltd. also manufactured, marketed, sold, and/or distributed LCDs to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

55. Defendant Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd. Its principal place of business is at 105 Challenger Road, Ridgefield Park, New Jersey 92612. During the Conspiracy Period, Samsung Electronics America, Inc. manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

56. Defendant Samsung Semiconductor, Inc. is a wholly-owned and controlled subsidiary of Samsung Electronics Co., Ltd. Its principal place of business is at 3655 North First Street, San Jose, California 95134. During the Conspiracy Period, Samsung Semiconductor, Inc. manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

57. Defendant Samsung SDI Co., Ltd. has its principal place of business at 673-7 Maetandong, Youngton-gu, Suwon, Republic of Korea. Samsung Electronics holds a controlling interest in Samsung SDI Co., Ltd. During the Conspiracy Period, Nokia purchased LCDs from Samsung SDI Co., Ltd. itself or via its subsidiaries. Samsung SDI Co., Ltd. also manufactured, marketed, sold, and/or distributed LCDs to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

58. Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a wholly-owned subsidiary of Samsung SDI Co., Ltd. Its principal place of business is 3333 Michelin Drive, Suite 700, Irvine, California 92618. During the Conspiracy Period, Samsung SDI America manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

59. Defendants Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Samsung Semiconductor, Inc.; Samsung SDI Co., Ltd.; and Samsung SDI America are sometimes referred to collectively herein as "Samsung." They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendants Samsung Electronics America, Inc.; Samsung Semiconductor, Inc.; Samsung SDI Co., Ltd.; and Samsung SDI America were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter egos or agents of Samsung Electronics Co., Ltd. Samsung Electronics Co., Ltd. dominated or controlled Samsung Electronics America, Inc.; Samsung

Semiconductor, Inc.; Samsung SDI Co. Ltd.; and Samsung SDI America regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

**h.  Sharp**

60.  Defendant Sharp Corporation has its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan.  During the Conspiracy Period, Nokia purchased LCDs from Sharp Corporation itself or via its subsidiaries.  Sharp Corporation also manufactured, marketed, sold, and/or distributed LCDs to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

61.  Defendant Sharp Electronics Corporation is a wholly-owned and controlled subsidiary of Sharp Corporation.  Its principal place of business is at Sharp Plaza, Mahwah, New Jersey 07430. During the Conspiracy Period, Sharp Electronics Corporation manufactured, marketed, sold, and/or distributed LCDs throughout the United States and elsewhere.

62.  Defendants Sharp Corporation and Sharp Electronics Corporation are sometimes referred to collectively herein as "Sharp."  They participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority. Alternatively, Defendant Sharp Electronics Corporation was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Sharp Corporation.  Sharp Corporation dominated or controlled Sharp Electronics Corporation regarding conspiracy activities and used that domination or control to charge artificially high prices for LCDs.

**i.  Toshiba**

63.  Defendant Toshiba Corporation has its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  During the Conspiracy Period, Nokia purchased LCDs from Toshiba Corporation itself or via its subsidiaries.  Toshiba Corporation also manufactured, marketed, sold, and/or distributed LCDs to other purchasers throughout the United States and elsewhere during the Conspiracy Period.

64.  Defendant Toshiba Mobile Display Co., Ltd., formerly known as Toshiba Matsushita Display Technology Co., Ltd., is a wholly-owned subsidiary of Toshiba Corporation.  Its principal place of business at Rivage Shinagawa, 1-8, Konan 4-chome, Minato-ku, Tokyo, 108-0075, Japan.

1  During the Conspiracy Period, Toshiba Mobile Display Co., Ltd. manufactured, marketed, sold,
2  and/or distributed LCDs throughout the United States and elsewhere.

3      65.    Defendant Toshiba America Electronic Components, Inc. is a wholly-owned and
4  controlled subsidiary of defendant Toshiba Corporation. Its corporate headquarters are at 19900
5  MacArthur Boulevard, Suite 400, Irvine, California 92612. During the Conspiracy Period, Toshiba
6  America Electronic Components, Inc. manufactured, marketed, sold, and/or distributed LCDs
7  throughout the United States and elsewhere.

8      66.    Defendant Toshiba America Information Systems, Inc. is a wholly-owned and
9  controlled subsidiary of Toshiba America, Inc. Its principal place of business is at 9470 Irvine
10 Boulevard, Irvine, California 92618. During the Conspiracy Period, Toshiba America Information
11 Systems, Inc. manufactured, marketed, sold, and/or distributed LCDs throughout the United States
12 and elsewhere.

13     67.    Defendants Toshiba Corporation; Toshiba Mobile Display Co., Ltd.; Toshiba America
14 Electronic Components, Inc.; and Toshiba America Information Systems, Inc. are referred to
15 collectively herein as "Toshiba." They participated in the conspiracy through the actions of their
16 respective officers, employees, and representatives acting with actual or apparent authority.
17 Alternatively, Defendants Toshiba Mobile Display Co., Ltd.; Toshiba America Electronic
18 Components, Inc.; and Toshiba America Information Systems, Inc. were members of the conspiracy
19 by virtue of their status during the Conspiracy Period as the alter egos or agents of Toshiba
20 Corporation. Toshiba Corporation dominated or controlled Toshiba Mobile Display Co., Ltd.;
21 Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc.
22 regarding conspiracy activities and used that domination or control to charge artificially high prices
23 for LCDs.

24     **3.**    **Agents and Co-Conspirators**

25     68.    The actions described in this Complaint were authorized, ordered, or done by
26 Defendants' respective officers, agents, employees, or representatives while actively engaged in the
27 management of each of the Defendants' business or affairs. Each Defendant acted as the agent or
28 joint venturer of or for the other Defendants with respect to the acts, violations, and common course

of conduct alleged herein. Each Defendant that is a subsidiary of a foreign parent acted as the United States agent for LCDs made by its parent company.

69.     Various persons and entities, some identified and some not yet identified, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. When Nokia establishes the identities of such co-conspirators, Nokia will seek leave to amend this Complaint to add such co-conspirators as Defendants. These co-conspirators are believed to include, without limitation, Chi Mei Optoelectronics Corporation and Chi Mei Optoelectronics USA, Inc. (collectively "Chi Mei"); LG Electronics, Inc. and LG Electronics USA, Inc. (collectively "LG Electronics"); HannStar Display Corporation ("HannStar"); and Royal Philips Electronics N.V. ("Royal Philips").

## E.     TRADE AND COMMERCE AFFECTED BY THE CONSPIRACY

70.     During the Conspiracy Period, Defendants, or one or more of their subsidiaries, sold LCDs in the United States through and into interstate and foreign commerce, including through the Northern District of California.

71.     During the Conspiracy Period, Defendants collectively controlled the market for LCDs, both globally and in the United States.

72.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

### 1.     LCDs

73.     LCDs are utilized in televisions, computer monitors, notebook computers, mobile wireless handsets, digital cameras, and numerous other electronic products. LCDs were the principal form of display screen used in mobile wireless handsets manufactured during the Conspiracy Period.

74.     LCDs use liquid crystal to control the passage of light. More specifically, LCDs are made of two glass sheets sandwiching a layer of liquid crystal. When voltage is applied, the liquid crystal is bent, allowing light to pass through to form a pixel. The combination of these pixels forms an image on the LCDs.

75.     Once an LCD leaves a manufacturing plant, it remains essentially unchanged as it moves through the distribution channel to purchasers of LCDs and LCD Products. LCDs are

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF     17

1    identifiable, discrete physical objects that do no change form or become an indistinguishable part of

2    the LCD Products, such as wireless handsets, laptop or desktop computers, or televisions, in which

3    the LCDs are contained.

4        76.    As a result, LCDs follow a traceable physical chain from Defendants to OMs to the

5    purchasers of LCD Products incorporating LCDs.

6

## 2.    Structure of the LCD Industry

7        77.    The LCD industry has several characteristics that facilitated a conspiracy to fix prices,

8    including high concentration, significant barriers to entry, homogeneity of products, consolidation,

9    multiple interrelated business relationships, and ease of information sharing.

10        78.    The LCD industry is highly concentrated and thus conducive to collusion. Throughout

11    the Conspiracy Period, Defendants and their co-conspirators collectively controlled a significant

12    share of the market for LCDs, both globally and in the United States.

13        79.    The LCD industry is characterized by high barriers to entry. New fabrication plants,

14    or "fabs," can cost upwards of \$2 to \$3 billion, and rapidly evolving technology and intellectual

15    property requirements require constant research and development and investment. Thus, firms

16    cannot enter the market for the production and sale of LCDs without an enormous capital investment.

17        80.    LCDs, whether incorporated into mobile wireless handsets, desktop monitors,

18    notebook and laptop computers, or televisions, are manufactured to a specific size, regardless of

19    manufacturer. The manufacture of standard panel sizes for products containing LCDs across the

20    LCD industry facilitates price transparency in the market for LCDs and enables LCD manufacturers

21    to monitor and analyze LCD prices, thereby enabling Defendants and their co-conspirators to enforce

22    their conspiracy.

23        81.    The LCD industry has experienced significant consolidation during the Conspiracy

24    Period, as reflected by:

25              •    The 2001 creation of AU Optronics through the merger of Acer Display and

26                 Unipac Electronics;

27              •    The 2005 transfer of Fujitsu Limited's LCD business to Sharp; and

28              •    The 2006 AU Optronics acquisition of Quanta Display, Inc.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF     18

82. Additional opportunities for collusive activity are presented by the many joint ventures, cross-licenses, and other cooperative arrangements in the LCD industry. Using the otherwise legitimate cover of such arrangements, Defendants implemented and policed their illegitimate agreements to fix prices and limit output for LCDs through the numerous meetings described hereinafter.

83. There were many opportunities for Defendants to discuss and exchange competitively-sensitive information through their common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies. Communication among the conspirators was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendants took advantage of these opportunities to discuss and agree upon their pricing of LCDs and monitor each other's compliance with their agreement.

### 3. The Market For LCDs

84. LCDs have no independent utility and have value only as components of LCD Products such as wireless handsets, computer monitors, notebook and laptop computers, and televisions. The demand for LCDs is thus derived directly from the demand for LCD Products.

85. The market for LCDs is enormous, in part because of the extraordinarily high demand for mobile wireless handsets and other LCD Products. For example, demand for mobile wireless handsets grew exponentially during the Conspiracy Period. In 1997, worldwide shipments of mobile wireless handsets totaled approximately 100 million units. This number ballooned to over one billion units by 2006. This increased demand for mobile wireless handsets drove a similar increase in the demand for LCDs during the Conspiracy Period. Shipments of LCDs for mobile wireless handsets grew from approximately 400 million panels in 2001 to over a billion panels in 2006.

86. The market for LCDs and the market for LCD Products are inextricably linked and intertwined because the LCD market exists to serve the market for LCD Products. The market for LCDs and the market for LCD Products are, for all intents and purposes, inseparable in that one would not exist without the other.

**F. VIOLATIONS ALLEGED**

87. Beginning at a date as yet unknown to Nokia, but at least as early as January 1, 1996, and continuing thereafter up to and including December 11, 2006, at a minimum, Defendants and their co-conspirators agreed, combined, and conspired to raise, maintain, and stabilize at artificial levels the prices at which LCDs have been sold throughout the world and the United States, including directly and indirectly to Nokia.

88. Defendants, through their officers, directors, and employees, effectuated a contract, combination, trust, cartel, or conspiracy between themselves and their co-conspirators by, among other things:

- Participating in meetings and conversations to discuss the prices and supply of LCDs in the global market, including the United States;

- Agreeing to fix the prices and limit the supply of LCDs sold in the global market, including the United States, in a manner that deprived Nokia of free and open competition as a direct and indirect purchaser;

- Issuing price announcements and quotations in accordance with the agreements reached; and

- Selling LCDs directly and indirectly to Nokia, including in the United States, at fixed, non-competitive prices.

**1. Defendants' and their Co-Conspirators' Agreements to Set Prices and Limit Production**

89. The LCD conspiracy alleged herein was effectuated through a combination of group and bilateral discussions that took place in Japan, South Korea, and Taiwan as well as in California and elsewhere in the United States. In the early years, beginning in at least 1996, representatives of Defendants located in Japan (the "Japanese Defendants"), such as Sharp and Toshiba, met and agreed to fix the prices for LCDs, generally, as well as for specific OEMs. The Japanese Defendants also agreed to limit the amount of LCDs each would produce.

1  90. In the early years, when the conspiracy was principally limited to the Japanese
2  Defendants, bilateral discussions were the preferred method of communication. As more
3  manufacturers entered the conspiracy, however, group meetings became more prevalent.

4  91. As LCD production in South Korea began to increase and become more sophisticated,
5  the Japanese Defendants expanded their meetings to include their South Korean competitors,
6  including Defendants LG Display and Samsung, which also agreed to fix prices and control supply.

7  92. At least as early as 2001, the Defendants located in South Korea convinced Taiwanese
8  LCD manufacturers, including Defendants AU Optronics and Chunghwa, as well as co-conspirators
9  Chi Mei and HannStar, to join the conspiracy to fix prices and control supply. Defendants'
10  conspiracy included agreements on the prices at which certain Defendants would sell LCDs and LCD
11  Products to their own corporate subsidiaries and affiliates that manufactured LCD Products, such as
12  mobile wireless handsets, thereby ensuring that LCD prices remained the same as between
13  Defendants and their OEM customers.

14  **a. "Crystal Meetings"**

15  93. In early 2001, high-level employees of at least two large manufacturers of LCDs met
16  in person and agreed to engage in periodic meetings to exchange sensitive competitive information
17  and to fix the price of LCDs and limit their production. From early 2001 through at least 2006,
18  officials from Defendants Samsung, AU Optronics, LG Display, Chunghwa, and Sharp, along with
19  co-conspirators Chi Mei and HannStar, met periodically in Taiwan to discuss and reach agreements
20  on LCD prices, price increases, production, and production capacity and did in fact reach agreements
21  increasing, maintaining, and/or fixing LCD prices and limiting their production. The group meetings
22  that these Defendants participated in were called "Crystal Meetings." Each Defendant attended
23  multiple meetings with one or more of the other Defendants during this period. The Crystal Meetings
24  occurred in Taiwan; other similar meetings took place in South Korea, Japan, and the United States
25  on a regular basis throughout this period.

26  94. The Crystal Meetings were highly organized and followed a set pattern. Meetings
27  among Defendants' high-level executives were called "CEO" or "Top" meetings; those among

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    21

Defendants' vice presidents and senior sales executives were called "Commercial" or "Operational" meetings.

95.     The CEO meetings occurred quarterly from approximately 2001 to 2006. The purpose and effect of these meetings was to stabilize or raise prices. Each meeting followed the same general pattern, with a rotating designated "chairman" who would use a projector or whiteboard to put up figures relating to the supply, demand, production, and prices of LCDs for the group to review. Those attending the meetings would take turns sharing information concerning prices, monthly and quarterly LCD fab output, production, and supply until a consensus was reached concerning the participants' prices and production levels of LCDs in the coming months or quarter.

96.     The structure of Commercial meetings was largely the same as CEO meetings. These meetings took place more frequently than CEO meetings and occurred approximately monthly.

97.     During all of these meetings, Defendants exchanged information about current and anticipated prices for their LCDs and, thereafter, reached agreement concerning the specific prices to be charged in the coming weeks and months for LCDs. Defendants set these prices in various ways, including, but not limited to, setting "target" prices, "floor" prices, and the price range or differential between different sizes and types of LCDs.

98.     During these CEO and Commercial meetings, Defendants also exchanged information about supply, demand, and their production of LCDs and, thereafter, reached agreement concerning the amounts each would produce. Defendants limited the production of LCDs in various ways, including, but not limited to, line slowdowns, delaying capacity expansion, shifting their production to different-sized panels, and setting target production levels.

99.     During these CEO and Commercial meetings, Defendants also agreed to conceal the fact and substance of the meetings and, in fact, took various steps to do so. Top executives and other officials attending these meetings were instructed on more than one occasion to not disclose the fact of these meetings to outsiders or even to other employees of Defendants not involved in LCD pricing or production. On at least one occasion, top executives at a CEO meeting staggered their arrivals and departures at the meeting site so that they would not be seen in the company of each other coming or going to such meeting.

1    100.  The structure of the so-called "Working Level" meetings was less formal than the

2    CEO or Commercial meetings and often occurred at restaurants over meals.  The purpose of the

3    Working Level meetings was to exchange information on price, supply, demand, and production

4    information, which then would be transmitted up the corporate reporting chain to those individuals

5    with pricing authority, which facilitated implementation of the conspiracy and effectuated the

6    agreements made at the CEO meetings and at the Commercial meetings.

7    101.  In approximately the Summer of 2006, when they began to have concerns about

8    antitrust issues, Defendants discontinued the Working Level meetings in favor of one-on-one

9    meetings to exchange pricing and supply information.  The meetings were coordinated so that on the

10   same date, each competitor met one-on-one with the other in a "Round Robin" set of meetings until

11   all competitors had met with each other.  These Round Robin meetings took place until at least

12   November or December of 2006.  The information obtained at these meetings was transmitted up the

13   corporate reporting chain to permit Defendants to maintain their price-fixing and production

14   limitation agreements.

15   **b.    Bilateral Discussions**

16   102.  During the Crystal Meetings, Defendants also agreed to engage in bilateral

17   communications with those Defendants not attending these meetings.  Certain Defendants were

18   "assigned" other Defendants not in attendance and agreed to and did in fact communicate with non-

19   attending Defendants to synchronize the price and production limitations agreed to at the Crystal

20   Meetings.  Participants at the Crystal Meetings contacted the Japanese Defendants to relay the

21   agreed-upon pricing and production limitations.

22   103.  The Crystal Meetings were also supplemented by additional bilateral discussions

23   between various Defendants in which they exchanged information about pricing, shipments, and

24   production.  As is more fully alleged below, Defendants had bilateral discussions with one another

25   during price negotiations with customers in order to avoid cutting prices and to implement the fixed

26   prices set by Defendants during the Crystal Meetings. These discussions usually took place between

27   sales and marketing employees in the form of telephone calls, emails, and instant messages.  The

28

1  information gained in these communications was then shared with supervisors and taken into account
2  in determining the price to be offered Defendants' customers.

3                        **c.    Defendants' Participation in Group and Bilateral Discussions**

4       104.   Defendants AU Optronics, LG Display, Samsung, and Chunghwa, along with co-
5  conspirators Chi Mei and HannStar, attended multiple CEO, Commercial, and working-level
6  meetings, as well as bilateral discussions, during the Conspiracy Period and at least between 2001
7  and 2006. These Defendants and co-conspirators agreed on prices, price increases, and production
8  limits and quotas for LCDs. Additionally, Quanta Display, Inc. and Unipac Electronics, which
9  merged with AU Optronics, participated in working-level meetings. At the CEO and Commercial
10 meetings, these Defendants agreed on prices, price increases, and production limits and quotas for
11 LCDs.

12      105.   LG Display has admitted and pleaded guilty to participating in the conspiracy from
13 September 2001 through June 2006 to fix the prices of LCDs sold worldwide; participating in
14 meetings, conversations, and communications in Taiwan, South Korea, and the United States to
15 discuss the prices of LCDs; agreeing to fix the prices of LCDs; and exchanging pricing and sales
16 information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. In
17 connection with its guilty plea, LG Display has agreed to pay a fine of $400 million, the second-
18 highest criminal fine ever imposed by the DOJ's Antitrust Division, for its participation in the
19 conspiracy.

20      106.   Chang Suk "C.S." Chung, an executive from LG Display, also pleaded guilty to
21 participating in the conspiracy to fix the prices of LCDs sold worldwide from September 2001
22 through June 2006. Specifically, Mr. Chung admitted that he participated in meetings, conversations,
23 and communications in Taiwan, South Korea, and the United States discussing the prices of LCDs;
24 agreed to fix the prices of LCDs at certain predetermined levels; issued price quotations in
25 accordance with the agreements reached; exchanged pricing and sales information for the purpose of
26 monitoring and enforcing adherence to the agreed-upon prices; and authorized, ordered, and
27 consented to the participation of subordinate employees in the conspiracy. In connection with his
28 guilty plea, Mr. Chung has agreed to serve a 7-month prison term and pay a criminal fine of $25,000.

1     107.    Bock Kwon, an executive from LG Display, also pleaded guilty to participating in the

2     conspiracy to fix the prices of LCDs sold worldwide, including the United States and California in

3     particular, from September 2001 through June 2006. Specifically, Mr. Kwon admitted that he

4     participated in meetings, conversations, and communications in Taiwan, South Korea, and the United

5     States to discuss the prices of LCDs; agreed to fix the prices of LCDs at certain predetermined levels,

6     issued price quotations in accordance with the agreements reached; exchanged pricing and sales

7     information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and

8     authorized, ordered, and consented to the participation of subordinate employees in the conspiracy.

9     In connection with his guilty plea, Mr. Kwon has agreed to serve a 12-month prison term and pay a

10    criminal fine of $30,000.

11    108.    In addition, Duk Mo Koo, former Executive Vice President and Chief Sales Officer

12    from LG Display, has been indicted for participating in the conspiracy to fix the prices of LCDs sold

13    worldwide, including the United States and California in particular, from December 2001 through

14    December 2005.    Specifically, Mr. Koo has been charged with participating in meetings,

15    conversations, and communications in Taiwan, South Korea, and the United Sates to discuss the

16    prices of LCDs, including the Crystal Meetings that took place in Taiwan. Mr. Koo has also been

17    charged with agreeing to fix the prices of LCDs at certain predetermined levels; issuing price

18    quotations in accordance with the agreements reached; exchanging pricing and sales information for

19    the purpose of monitoring and enforcing adherence to the agreed-upon prices; authorizing, ordering,

20    and consenting to the participation of subordinate employees in the conspiracy; accepting payment

21    for the supply of LCDs sold at collusive, noncompetitive prices to customers in the United States; and

22    taking steps to conceal the conspiracy and his conspiratorial contacts.

23    109.    Chunghwa has admitted and pleaded guilty to participating in the conspiracy from

24    September 2001 to December 2006 to fix the prices of LCDs sold worldwide and to participating in

25    meetings, conversations, and communications in Taiwan to discuss the prices of LCDs; agreeing to

26    fix the prices of LCDs; and exchanging pricing and sales information for the purpose of monitoring

27    and enforcing adherence to agreed-upon prices. In connection with its guilty plea, Chunghwa has

28    agreed to pay a criminal fine of $65 million.

110. In addition, two current executives from Chunghwa, Chih-Chun "C.C." Liu and Hsueh-Lung "Brian" Lee, and one former executive from Chunghwa, Chieng-Hon "Frank" Lin, pleaded guilty to participating in the conspiracy, including by participating in meetings, conversations, and communications in Taiwan, South Korea, and the United States to discuss the prices of LCDs; agreeing to fix the prices of LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy. Mr. Lin pled guilty to participating in the conspiracy from June 2003 through December 2006 and has agreed to serve a 9-month prison term and pay a criminal fine of $50,000. Mr. Liu pled guilty to participating in the conspiracy from September 2001 through July 2005 and has agreed to serve a 7-month prison term and pay a criminal fine of $30,000. Mr. Lee pled guilty to participating in the conspiracy from September 2001 through December 2006 and has agreed to serve a 6-month prison term and pay a criminal fine of $20,000.

111. In addition, two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, have been indicted for participating in the conspiracy to fix the prices of LCDs sold worldwide, including by participating in meetings, conversations, and communications in Taiwan, South Korea, and the United States to discuss the prices of LCDs, including the Crystal Meetings that took place in Taiwan; agreeing to fix the prices of LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; accepting payment for the supply of LCDs sold at collusive, noncompetitive prices to customers in the United States; and taking steps to conceal the conspiracy and their conspiratorial contacts. Mr. Lin has been indicted for his participation from September 2001 through April 2003. Mr. Cheng has been indicted for his participation from October 2001 through September 2004.

112. Defendant Sharp has admitted and pleaded guilty to participating in the conspiracy with unnamed co-conspirators to fix the prices of LCDs sold to Dell from April 2001 to December

2006, to Apple Computer from September 2005 to December 2006, and to Motorola from the fall of 2005 to the middle of 2006, and to participating in bilateral meetings, conversations, and communications in Japan and the United States with unnamed co-conspirators to discuss the prices of LCDs; agreeing to fix the prices of LCDs; and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. In connection with its guilty plea, Sharp has agreed to pay a fine of $120 million.

113. Defendant Sharp participated in multiple Working Level meetings, as well as bilateral discussions with other Defendants, during which it discussed and reached agreements with other Defendants on prices for LCDs during the Conspiracy Period.

114. Defendant Sharp also participated in multiple bilateral discussions with other Defendants, including Toshiba and Epson, during the Conspiracy Period. Through these discussions, Sharp agreed on prices, price increases, production quotas, and production limits for LCDs. Because Toshiba and Epson were Sharp's primary competitors in the sale of LCDs used in mobile wireless handsets, Sharp knew that it could not have fixed the prices of LCDs incorporated into such handsets – as Sharp admitted it did in its guilty plea – unless it reached agreements with Toshiba and Epson to do the same.

115. Defendant Toshiba also participated in the conspiracy by entering into joint ventures and other arrangements to manufacture or source LCDs with one or more of Defendants. The purpose and effect of these joint ventures by Toshiba and others was to limit the supply of LCDs and fix prices of such panels at unreasonably high levels and to aid, abet, notify, and facilitate the implementation of the price-fixing and production-limitation agreements reached at the meetings. During the Conspiracy Period, Toshiba sought and formed strategic partnerships with other LCD manufacturers that allowed it to easily communicate and coordinate prices and production levels with other manufacturers as part of the overall conspiracy alleged herein. For instance, Toshiba formed HannStar in January 1998 as a manufacturing joint venture. In 2006, Toshiba purchased a 20% stake in LG Display's LCD manufacturing facility in Poland. The operation and management of these many different joint ventures afforded Toshiba and the other Defendant joint-venture partners regular

opportunities to communicate with each other to agree on prices, price increases, and production limits and quotas for LCDs that each Defendant manufactured and sold.

116. Defendant Epson has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the price of LCDs sold to Motorola. Epson has also admitted and pleaded guilty to participating in the conspiracy from 2005 through 2006 to fix the prices of LCDs; participating in meetings, conversations, and communications in Japan and the United States to discuss the prices of LCDs; agreeing to fix the prices of LCDs; exchanging pricing and sales information for the purpose of monitoring; and enforcing adherence to the agreed-upon prices. In connection with its guilty plea, Epson has agreed to pay a fine of $26 million.

117. Defendant Hitachi has admitted and pleaded guilty to participating in the conspiracy with unnamed conspirators to fix the prices of LCDs sold to Dell. Hitachi has admitted and pleaded guilty to participating in the conspiracy from April 2001 to March 2004 to fix the prices of LCDs and to participating in meetings, conversations, and communications in Japan, Korea, and the United States to discuss the prices of LCDs; agreeing to fix the prices of LCDs; issuing price quotations in accordance with the agreements reached; and exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices. In connection with its guilty plea, Hitachi has agreed to pay a fine of $31 million.

118. In addition, a former Hitachi executive, Sakae Someya, has been indicted for participating in the conspiracy to fix the prices of LCDs sold to Dell from January 2001 to December 2004. Specifically, Mr. Someya has been charged with participating in meetings, conversations, and communications to discuss the prices of LCDs. Mr. Someya has also been charged with agreeing to fix the prices of LCDs at certain predetermined levels; issuing price quotations in accordance with the agreements reached; exchanging pricing and sales information for the purpose of monitoring and enforcing adherence to the agreed-upon prices; authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy; issuing price quotations in accordance with the agreements reached; accepting payment for the supply of LCDs sold at collusive, noncompetitive prices; and taking steps to conceal the conspiracy and their conspiratorial contacts.

119. Whenever Nokia refers to a corporate family or companies by a single name in its allegations of participation in the conspiracy, Nokia is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their employees and agents and was a party to the agreements reached in them.

## 2. The Role of Trade Associations During the Conspiracy Period

120. The LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year. These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for Defendants to cooperate and discuss prices.

121. One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong. Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] Japan and Korea TFT-LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

122. South Korean manufacturers, including LG Display and Samsung, had similar trade associations during the Conspiracy Period, Electronic Display Industrial Research Association of Korea ("EDIRAK") and the Korea Display Equipment Material Industry Association ("KODEMIA"). EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United

States Display Consortium ("USDC"). Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

123. Japanese manufacturers of LCDs had a similar organization of their own. The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of LCDs. Its members include Sharp, Toshiba, Hitachi, and a Japanese subsidiary of Samsung. Like KODEMIA and TTLA, SEAJ was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

124. In addition to these national trade associations, the Society for Information Display ("SID") put on multiple meetings each year that were attended by executives from all of the major producers. One of these meetings had been known as the SID Symposium but was renamed the "SID International Symposium and Business Conference." SID also put on a long-running conference called the International Display Research Conference.

125. The 2004 SID International Symposium and Business Conference ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by H.B. Chen, President and CEO of AU Optronics. This was followed shortly by a presentation entitled "The FPD Capital Equipment Investment Environment," which informed the attendees about "investments planned at the major display manufacturers." A representative of DisplaySearch also spoke about the LCD market. There were presentations by analysts from iSuppli/Stanford Resources and other industry experts. This was all followed by a "networking reception – sponsored by LG Philips LCD," to which all conference attendees were invited to participate.

126. SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of AU Optronics. This time it was called "2005: Beyond the Crystal Gateway." A DisplaySearch representative provided "the latest outlook for flat panel displays covering pricing, demand, and supply . . . and the cost and margin outlook for key FPDs will be projected." Again, these discussions about the LCD market were followed by a "networking reception." Among the attendees at SID 2004 were Bruce Berkoff of LG Display, Jun Souk and Dong-Hun Lee of Samsung, H.B. Chen of AU Optronics, and Joel Pollack of Sharp. Senior executives from Sharp and Hitachi also attended.

127. The SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle. Jun H. Souk, Executive Vice President of Samsung, gave a presentation entitled "Managing the Crystal Cycles," which was paraphrased as follows: "By reviewing what happened during the business up and down cycles of the LCD in the past, we have learned lessons that will reduce the burden in future cycles. Efforts made in cost reduction, line-investment timing, and new market generation will be described."

128. SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing." Among the attendees at SID 2005 were Bruce Berkoff of LG Display as well as Sang Wan Lee, Jun Souk, and Joe Virginia of Samsung. SID 2005 also featured presentations regarding developments in LCD technology by officials from AU Optronics, Sharp, LG Display, Samsung, and Hitachi.

129. The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005 in Okinawa, Japan. The initial conference was held from February 27 to March 2, 2005, and the 2006 conference was held from February 28 to March 3, 2006.

130. Participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators. As Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

131. Among the participants at GFPC 2006 were Mr. Souk and Ho Kyoon Chung of Samsung, Shigaeki Mizushima of Sharp, Yoshihide Fuji of Toshiba, and Dr. Hui Hsiung of AU Optronics.

132. As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving Defendants further opportunities to discuss prices and output.

## G. GOVERNMENT INVESTIGATIONS OF PRICE-FIXING

133. In December 2006, authorities in Japan, South Korea, the European Union, and the United States revealed the existence of a comprehensive investigation into anti-competitive activity

among LCD manufacturers. In a December 11, 2006 filing with the United States Securities and Exchange Commission, Defendant LG Display disclosed that officials from the South Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its San Jose, California office. Later, LG Display disclosed that it was under similar investigations by the European Commission, the Canadian Competition Bureau, and the Taiwan Fair Trade Commission.

134. On December 12, 2006, news reports indicated that, in addition to LG Display, Defendants Samsung, Sharp, and AU Optronics were also under investigation.

135. The DOJ acknowledged that it was "investigating the possibility of anticompetitive practices and is cooperating with foreign authorities."

136. At least one of Defendants has approached the Antitrust Division of the DOJ to enter into a leniency agreement with respect to Defendants' conspiracy to fix prices of LCDs. In order to enter into a leniency agreement under the Corporate Leniency Policy of the DOJ, this Defendant would have reported Defendants' price-fixing conspiracy to the DOJ and would have confessed its own participation in the price-fixing conspiracy.

137. On or about November 10, 2008, Chunghwa agreed to plead guilty and pay a $65 million criminal fine for its role in the conspiracy to fix the price of LCDs. On or about February 3, 2009, former LG Display executive Duk Mo Koo and two former Chunghwa executives, Cheng Yuan Lin and Wen Jun Cheng, were indicted for participating in the global LCD price-fixing conspiracy. On or about November 11, 2008, Sharp agreed to plead guilty and pay a $120 million criminal fine for its role in the conspiracy to fix the price of LCDs. On or about November 12, 2008, LG Display agreed to plead guilty and pay a $400 million criminal fine for its role in the conspiracy to fix the price of LCDs. On or about January 15, 2009, Chang Suk "C.S." Chung, an executive from LG Display, agreed to plead guilty to participating in the conspiracy from September 2001 to June 2006. Mr. Chung agreed to serve a 7-month prison sentence and pay a $25,000 criminal fine. On or about April 27, 2009, another high level executive of LG Display, Bock Kwon, agreed to plead guilty to global LCD price fixing. On or about March 5, 2009, Hitachi agreed to plead guilty and pay a $31 million criminal fine for its role in the conspiracy to fix the price of LCDs. On or about August 25,

1   2009, Epson agreed to plead guilty and pay a $26 million criminal fine for its role in the conspiracy
2   to fix the price of LCDs.

3       138.    The DOJ Antitrust Division's investigation of the remaining Defendants is ongoing
4   and is expected to result in additional guilty pleas and criminal fines from the other Defendants to this
5   action.

6       139.    On July 13, 2009, the European Commission issued a press release confirming that in
7   May 2009, it sent a Statement of Objections to various LCD manufacturers concerning their
8   participation in a conspiracy in violation of Article 81 of the EC Treaty and Article 53 of the
9   Agreement on the European Economic Area. Defendants AU Optronics, Philips, and LG Display, as
10  well as co-conspirator Chi Mei, have acknowledged receiving the Statement of Objections, while the
11  remaining Defendants (Chunghwa, Epson, Hitachi, Samsung, Sharp, and Toshiba) have admitted
12  being under investigation by the European Commission.

13  ## H.    PLAINTIFF'S INJURY

14      140.    Nokia has suffered injury as a result of Defendants' conspiracy to raise, fix, stabilize,
15  or maintain the prices of LCDs at artificial levels.

16      141.    Nokia has suffered a direct, substantial, and reasonably foreseeable injury as a result
17  of Defendants' and their co-conspirators' agreement to raise, fix, or maintain the price of LCDs at
18  artificial levels. During the Conspiracy Period, Defendants' and their co-conspirators' price-fixing
19  agreement artificially inflated the price of LCDs purchased by Nokia, causing Nokia to pay higher
20  prices for LCDs than it would have in the absence of the conspiracy. The conspiracy artificially
21  inflated the prices of LCDs using TFT, CSTN, FSTN, and MSTN technology in LCD Products,
22  including mobile wireless handsets.

23      142.    During the Conspiracy Period, Defendants' and their co-conspirators' illegal
24  conspiracy also artificially inflated the price of LCDs ultimately incorporated into LCD Products
25  purchased by Nokia, causing Nokia to pay higher prices for such LCD Products than it would have in
26  the absence of the conspiracy.

27

28

## I.    FRAUDULENT CONCEALMENT

143.    Nokia did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until after December 2006, after the investigations by antitrust regulators became public, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their contract, combination, or conspiracy. Because Defendants' agreement, understanding, and conspiracy were kept secret, Nokia was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for LCDs.

144.    The affirmative acts of Defendants and their co-conspirators alleged herein, including, among other things, acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

145.    By its very nature, the conspiracy was inherently self-concealing. As alleged above, Defendants had secret discussions about price and output. Defendants agreed not to publicly discuss the existence or the nature of their agreement. In fact, the top executives who attended the CEO and Commercial Crystal Meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret. Moreover, when the participants in those meetings became fearful that they might be subject to antitrust scrutiny, they agreed to meet one-on-one for the so-called Round Robin meetings. Defendants also repeatedly gave pretextual justifications for the inflated prices of LCDs in furtherance of the conspiracy.

146.    There have been a variety of other purportedly market-based explanations for price increases. The first was supply and demand. For example, in early 1999, Bock Kwon, Vice President of LG Philips' Sales Division, and Yoon-Woo Lee, President and CEO of Samsung's Semiconductor Division, falsely reported that price increases were due to acute shortages.

147.    Another false rationale provided by Defendants was undercapitalization. In 1999, Joel Pollack, a marketing manager for Sharp, stated that "[p]rices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization. The [low prices] have starved the industry."

148. A third rationale for the steep price hikes of 1999 was offered by Yoon-Woo Lee, CEO of Samsung. He claimed that the demand for larger panels was reducing the industry's capacity because each display used more square inches of motherglass substrate.

149. Increased demand was repeatedly cited by Defendants throughout the Conspiracy Period. On January 14, 2002, Bruce Berkoff, Executive Vice-President at LG Philips was quoted CNET News as saying that price increases were due to shortages. He claimed that "demand grew so fast that the supply can't keep up." Koo Duk-Mo, an executive at LG Philips, similarly predicted in 1999 that prices would rise 10 to 15% due to increased demand for the holiday season. In 2005, Duke Koo of LG Philips stated that "[w]e are seeing much stronger demand for large-size LCD televisions than expected, so LCD TV supply is likely to remain tight throughout next year."

150. Hsu Jen-Ting, a vice president at Chi Mei, and Chen Shuen-Bin, president of AU Optronics, offered another rationale for the 2001 price hike in an interview for the Taiwan Economic News in October 2001. They blamed component shortages due to the delayed expansion of fifth generation production lines and new demand from the replacement of traditional cathode ray tubes with LCD monitors.

151. These explanations were all pretextual and each served to cover up the conspiracy. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to Nokia's claims.

## J. VIOLATIONS ALLEGED

### First Claim for Relief: Violation of Sherman Act

152. Nokia incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153. Beginning at a time presently unknown to Nokia, but at least as early as January 1, 1996, and continuing through at least December 11, 2006, the exact dates being unknown to Nokia, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for LCDs in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

154. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

    A. To fix, raise, maintain, and stabilize the price of LCDs;

    B. To allocate markets for LCDs among themselves; and

    C. To allocate among themselves the production of LCDs.

155. The combination and conspiracy alleged herein has had the following effects, among others:

    A. Price competition in the sale of LCDs has been restrained, suppressed and/or eliminated in the United States;

    B. Prices for LCDs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, supra-competitive levels throughout the United States; and

    C. Those who purchased LCDs produced by Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

156. Nokia has been injured in its business and property by paying more for LCDs purchased from Defendants, their co-conspirators, and others than it would have paid and will pay in the absence of the combination and conspiracy.

157. Defendants' and their co-conspirators' conduct involved United States import trade or commerce and/or had a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce that resulted in the injuries suffered by Nokia and gave rise to Nokia's antitrust claims. As a result, Nokia has suffered injury as a direct, proximate, and reasonably foreseeable result of Defendants' conspiracy to fix the price of LCDs. Nokia has been injured and will continue to be injured in its business and property by paying more for LCDs purchased from Defendants, their co-conspirators, and others than it would have paid and will pay in the absence of the combination and conspiracy.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    36

158. Because Nokia has suffered injury as a direct, proximate, and foreseeable result of Defendants' conspiracy to fix the price of LCDs, Nokia is entitled to damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its purchases of LCDs produced by Defendants, their co-conspirators, and others.

159. Because Nokia faces a serious risk of future injury, Nokia is entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all Defendants, preventing and restraining the violations alleged herein. Some of the Defendants continue to manufacture, market, sell, and/or distribute LCDs throughout the United States and elsewhere, and the market for LCDs remains highly concentrated and susceptible to collusion. Defendants continue to have the incentive to collude to increase LCD prices or stabilize LCD price declines, and Defendants' conspiracy to fix the price of LCDs could be easily repeated and concealed from Nokia.

**Second Claim for Relief: Violation of Cartwright Act**

160. Nokia incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

161. During the Conspiracy Period, Nokia conducted a substantial volume of business in California. Nokia sold mobile wireless handsets and other LCD Products to retailers and other customers in California. Nokia has a research and development facility as well as a number of corporate development and marketing offices throughout California. During the Conspiracy Period, Nokia invested a substantial amount of money in California through various entertainment venues as well as business development and marketing enterprises. Nokia was present in California and conducted substantial business in California during the Conspiracy Period. Accordingly, Nokia is entitled to the protection of the laws of California.

162. In addition, Defendants Chunghwa, Epson, Hitachi, LG Display, and Sharp all admitted in their plea agreements that acts in furtherance of their conspiracy to fix the price of LCDs were carried out in California. Defendants AU Optronics, Chunghwa, Epson, Hitachi, LG Display, Samsung, and Toshiba all maintained offices in California during the Conspiracy Period. Employees at Defendants' locations in California participated in meetings and engaged in bilateral communications in California and intended and did carry out Defendants' anticompetitive agreement

to fix the price of LCDs. Defendants' conduct within California thus injured Nokia both in California and throughout the United States.

163. Beginning at a time presently unknown to Nokia, but at least as early as January 1, 1996, and continuing thereafter at least up to and including December 11, 2006, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Bus. & Prof. Code §§ 16700 *et seq.* Defendants have each acted in violation of the Cartwright Act to fix, raise, stabilize, and maintain prices of, and allocate markets for, LCDs at supra-competitive levels. Defendants' conduct substantially affected California commerce.

164. The aforesaid violations of California Bus. & Prof. Code §§ 16700 *et seq.*, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, LCDs.

165. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following:

  A. To fix, raise, maintain and stabilize the price of LCDs;

  B. To allocate markets for LCDs amongst themselves; and

  C. To allocate among themselves the production of LCDs.

166. The combination and conspiracy alleged herein has had, *inter alia,* the following effects:

  A. Price competition in the sale of LCDs has been restrained, suppressed, and/or eliminated in the State of California;

  B. Prices for LCDs sold by Defendants, their co-conspirators, and others have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels in the State of California; and

  C. Those who purchased LCDs from Defendants, their co-conspirators, and others have been deprived of the benefits of free and open competition.

167. As a result of the alleged conduct of Defendants, Nokia paid supra-competitive, artificially inflated prices for LCDs and LCD Products that it purchased during the Conspiracy Period.

168. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCDs and LCD Products purchased directly or indirectly from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy.

169. As a result of Defendants' violation of the Cartwright Act, California Bus. & Prof. Code §§ 16700 *et seq.*, Nokia is entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to § 16750(a).

### Third Claim for Relief: Violation of State Antitrust and Unfair Competition Laws

170. Nokia incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

171. Nokia believes and asserts that all of its purchases of LCDs and Products are actionable pursuant to the federal and the California antitrust laws as alleged in the First and Second Claims for Relief. In the alternative, Nokia alleges this Third Claim For Relief under the laws of Arizona, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

172. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Arizona Rev. Stat. Ann. §§ 44-1401 *et seq:*

        A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Arizona and fixed, raised, maintained, and stabilized LCD prices in Arizona at artificially high, non-competitive levels;

        B. As a result, Defendants' conspiracy substantially affected Arizona commerce;

        C. During the Conspiracy Period, Nokia conducted a substantial volume of business in Arizona. Nokia sold LCD Products to retailers and/or other customers in Arizona. As a result of its presence in Arizona and the substantial

business it conducts in Arizona, Nokia is entitled to the protection of the laws of Arizona; and

D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Arizona Rev. Stat. Ann. §§ 44-1401, *et seq.*

173. By reason of the foregoing, Defendants have engaged in unfair competition in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

A. Defendants committed acts of unfair competition, as defined by California Bus. & Prof. Code §§ 17200, *et seq.,* by engaging in a conspiracy to fix and stabilize the price of LCDs as described above;

B. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices with the meaning of California Bus. & Prof. Code §§ 17200, *et seq.,* including, but not limited to violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and violation of the Cartwright Act, California Bus. & Prof. Code §§ 16720 *et seq.*;

C. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act and/or the Cartwright Act;

D. Defendants' acts or practices are fraudulent or deceptive within the meaning of California Bus. & Prof. Code §§ 17200 *et seq.;*

E. Defendants' conduct was carried out, effectuated, and perfected within the State of California. Defendants Chunghwa, Epson, Hitachi, LG Display, and

Sharp all admitted that acts in furtherance of the conspiracy to fix the price of LCDs were carried out in California;

F.   During the Conspiracy Period, Nokia conducted a substantial volume of business in California. Nokia sold mobile wireless handsets and other LCD Products to retailers and other customers in California. Nokia had a research and development facility in San Diego, California as well as corporate offices located throughout California. During the Conspiracy Period, Nokia invested a substantial amount of money in California through various entertainment venues as well as business development and marketing enterprises. As a result of its presence in California and the substantial business it conducts in California, Nokia is entitled to the protection of the laws of California.

G.   As a result of Defendants' violation of the California Unfair Competition Law, California Bus. & Prof. Code §§ 17200 *et seq.*, Nokia is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

174.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501 *et seq.*

A.   Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in the District of Columbia and fixed, raised, maintained, and stabilized LCD prices in the District of Columbia at artificially high, non-competitive levels;

B.   As a result, Defendants' conspiracy substantially affected District of Columbia commerce;

C.   During the Conspiracy Period, Nokia conducted a substantial volume of business in the District of Columbia. Nokia sold LCD Products to retailers and/or other customers in the District of Columbia and maintained a corporate office in the District of Columbia. As a result of its presence in the District of

Columbia and the substantial business it conducts in the District of Columbia, Nokia is entitled to the protection of the laws of the District of Columbia; and

D.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under District of Columbia Code Ann. §§ 28-4501, *et seq.*

175.   By reason of the foregoing, Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. Ann. §§ 501.201, *et seq*.

A.     Defendants committed acts of unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as defined by Florida Stat. Ann. §§ 501.201 *et seq.*, by engaging in a conspiracy to fix and stabilize the price of LCDs as described above;

B.     During the Conspiracy Period, Nokia conducted a substantial volume of business in Florida. Nokia sold LCD Products to retailers and/or other customers in Florida and maintained corporate offices in Florida. As a result of its presence in Florida and the substantial business it conducts in Florida, Nokia is entitled to the protection of the laws of Florida;

C.     The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, substantially affected Florida commerce and consumers; and

D.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Florida Stat. Ann. §§501.201 *et seq.*

176. By reason of the foregoing, Defendants have engaged in unfair competition and/or unfair or deceptive acts or practices in restraint of trade in violation of Hawaii Rev. Stat. Ann. §§ 480-1, *et seq.*

    A.    Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Hawaii and fixed, raised, maintained, and stabilized LCD prices in Hawaii at artificially high, non-competitive levels;

    B.    As a result, Defendants' conspiracy substantially affected Hawaii commerce;

    C.    During the Conspiracy Period, Nokia conducted a substantial volume of business in Hawaii. Nokia sold LCD Products to retailers and/or other customers in Hawaii. As a result of its presence in Hawaii and the substantial business it conducts in Hawaii, Nokia is entitled to the protection of the laws of Hawaii; and

    D.    As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Hawaii Rev. Stat. Ann. §§ 480-1, *et seq.*

177. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. 10/1 *et seq.*

    A.    Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Illinois and fixed, raised, maintained, and stabilized LCD prices in Illinois at artificially high, non-competitive levels;

    B.    As a result, Defendants' conspiracy substantially affected Illinois commerce;

    C.    During the Conspiracy Period, Nokia conducted a substantial volume of business in Illinois. Nokia sold LCD Products to retailers and/or other customers in Illinois and maintained a corporate office in Illinois. As a result of its presence in Illinois and the substantial business it conducts in Illinois, Nokia is entitled to the protection of the laws of Illinois; and

D.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under 740 Illinois Comp. Stat. 10/1 *et seq.*

178.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code Ann. §§ 553.1 *et seq.*

A.     Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Iowa and fixed, raised, maintained, and stabilized LCD prices in Iowa at artificially high, non-competitive levels;

B.     As a result, Defendants' conspiracy substantially affected Iowa commerce;

C.     During the Conspiracy Period, Nokia conducted a substantial volume of business in Iowa. Nokia sold LCD Products to retailers and/or other customers in Iowa. As a result of its presence in Iowa and the substantial business it conducts in Iowa, Nokia is entitled to the protection of the laws of Iowa; and

D.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Iowa Code Ann. §§ 553.1 *et seq.*

179.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

A.     Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Kansas and fixed, raised, maintained, and stabilized LCD prices in Kansas at artificially high, non-competitive levels;

B.     As a result, Defendants' conspiracy substantially affected Kansas commerce;

C.     During the Conspiracy Period, Nokia conducted a substantial volume of business in Kansas. Nokia sold LCD Products to retailers and/or other

customers in Kansas. As a result of its presence in Kansas and the substantial business it conducts in Kansas, Nokia is entitled to the protection of the laws of Kansas; and

D.  As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Kansas Stat. Ann. §§ 50-101 *et seq.*

180.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. tit. 10, §§ 1101 *et seq.*

A.  Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Maine and fixed, raised, maintained, and stabilized LCD prices in Maine at artificially high, non-competitive levels;

B.  As a result, Defendants' conspiracy substantially affected Maine commerce;

C.  During the Conspiracy Period, Nokia conducted a substantial volume of business in Maine. Nokia sold LCD Products to retailers and/or other customers in Maine. As a result of its presence in Maine and the substantial business it conducts in Maine, Nokia is entitled to the protection of the laws of Maine; and

D.  As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Maine Rev. Stat. Ann. tit. 10, §§ 1101 *et seq.*

181.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

A.     Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Michigan and fixed, raised, maintained, and stabilized LCD prices in Michigan at artificially high, non-competitive levels;

B.     As a result, Defendants' conspiracy substantially affected Michigan commerce;

C.     During the Conspiracy Period, Nokia conducted a substantial volume of business in Michigan. Nokia sold LCD Products to retailers and/or other customers in Michigan. As a result of its presence in Michigan and the substantial business it conducts in Michigan, Nokia is entitled to the protection of the laws of Michigan; and

D.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

182.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. Ann. §§ 325D.49 *et seq.*

A.     Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Minnesota and fixed, raised, maintained, and stabilized LCD prices in Minnesota at artificially high, non-competitive levels;

B.     As a result, Defendants' conspiracy substantially affected Minnesota commerce;

C.     During the Conspiracy Period, Nokia conducted a substantial volume of business in Minnesota. Nokia sold LCD Products to retailers and/or other customers in Minnesota. As a result of its presence in Minnesota and the substantial business it conducts in Minnesota, Nokia is entitled to the protection of the laws of Minnesota; and

D.     As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and

LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Minnesota Stat. Ann. §§ 325D.49 *et seq.*

183. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1 *et seq.*

    A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Mississippi and fixed, raised, maintained, and stabilized LCD prices in Mississippi at artificially high, non-competitive levels;

    B. As a result, Defendants' conspiracy substantially affected Mississippi commerce;

    C. During the Conspiracy Period, Nokia conducted a substantial volume of business in Mississippi. Nokia sold LCD Products to retailers and/or other customers in Mississippi. As a result of its presence in Mississippi and the substantial business it conducts in Mississippi, Nokia is entitled to the protection of the laws of Mississippi; and

    D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Mississippi Code Ann. §§ 75-21-1 *et seq.*

184. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.*

    A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Nebraska and fixed, raised, maintained, and stabilized LCD prices in Nebraska at artificially high, non-competitive levels;

    B. As a result, Defendants' conspiracy substantially affected Nebraska commerce;

    C. During the Conspiracy Period, Nokia conducted a substantial volume of business in Nebraska. Nokia sold LCD Products to retailers and/or other

customers in Nebraska. As a result of its presence in Nebraska and the substantial business it conducts in Nebraska, Nokia is entitled to the protection of the laws of Nebraska; and

D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Nebraska Rev. Stat. §§ 59-801 *et seq.*

185. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Nevada and fixed, raised, maintained, and stabilized LCD prices in Nevada at artificially high, non-competitive levels;

B. As a result, Defendants' conspiracy substantially affected Nevada commerce;

C. During the Conspiracy Period, Nokia conducted a substantial volume of business in Nevada. Nokia sold LCD Products to retailers and/or other customers in Nevada. As a result of its presence in Nevada and the substantial business it conducts in Nevada, Nokia is entitled to the protection of the laws of Nevada; and

D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Nevada Rev. Stat. Ann. §§ 598A.010 *et seq.*

186. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in New Mexico and fixed, raised, maintained, and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF    48

1                      stabilized LCD prices in New Mexico at artificially high, non-competitive

2                      levels;

3           B.      As a result, Defendants' conspiracy substantially affected New Mexico

4                      commerce;

5           C.      During the Conspiracy Period, Nokia conducted a substantial volume of

6                      business in New Mexico. Nokia sold LCD Products to retailers and/or other

7                      customers in New Mexico. As a result of its presence in New Mexico and the

8                      substantial business it conducts in New Mexico, Nokia is entitled to the

9                      protection of the laws of New Mexico; and

10         D.      As a direct and proximate result of Defendants' conduct, Nokia has been

11                     injured in its business and property by paying more for LCD Products and

12                     LCDs purchased from Defendants, their co-conspirators, and others than it

13                     would have paid in the absence of Defendants' combination and conspiracy,

14                     and is entitled to relief under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

15     187.     By reason of the foregoing, Defendants have entered into agreements in restraint of

16 trade in violation of New York Gen. Bus. Law §§ 340 *et seq.*

17         A.      Defendants' conspiracy restrained, suppressed, and/or eliminated competition

18                     in the sale of LCDs in New York and fixed, raised, maintained, and stabilized

19                     LCD prices in New York at artificially high, non-competitive levels;

20         B.      As a result, Defendants' conspiracy substantially affected New York

21                     commerce;

22         C.      During the Conspiracy Period, Nokia conducted a substantial volume of

23                     business in New York. Nokia sold LCD Products to retailers and/or other

24                     customers in New York. Nokia Inc. is also headquartered in New York. As a

25                     result of its presence in New York and the substantial business it conducts in

26                     New York, Nokia is entitled to the protection of the laws of New York; and

27         D.      As a direct and proximate result of Defendants' conduct, Nokia has been

28                     injured in its business and property by paying more for LCD Products and

LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under New York Gen. Bus. Law §§ 340 *et seq.*

188. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. Ann. §§ 75-1 *et seq.*

A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in North Carolina and fixed, raised, maintained, and stabilized LCD prices in North Carolina at artificially high, non-competitive levels;

B. As a result, Defendants' conspiracy substantially affected North Carolina commerce;

C. During the Conspiracy Period, Nokia conducted a substantial volume of business in North Carolina. Nokia sold LCD Products to retailers and/or other customers in North Carolina and maintained corporate offices in North Carolina. As a result of its presence in North Carolina and the substantial business it conducts in North Carolina, Nokia is entitled to the protection of the laws of North Carolina; and

D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under North Carolina Gen. Stat. Ann. §§ 75-1 *et seq.*

189. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code Ann. §§ 51-08.1-01 *et seq.*

A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in North Dakota and fixed, raised, maintained, and stabilized LCD prices in North Dakota at artificially high, non-competitive levels;

B. As a result, Defendants' conspiracy substantially affected North Dakota commerce;

C. During the Conspiracy Period, Nokia conducted a substantial volume of business in North Dakota. Nokia sold LCD Products to retailers and/or other customers in North Dakota. As a result of its presence in North Dakota and the substantial business it conducts in North Dakota, Nokia is entitled to the protection of the laws of North Dakota; and

D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under North Dakota Cent. Code Ann. §§ 51-08.1-01 *et seq.*

190. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Rev. Code Ann. §§ 37-1-3.1 *et seq.*

A. Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in South Dakota and fixed, raised, maintained, and stabilized LCD prices in South Dakota at artificially high, non-competitive levels;

B. As a result, Defendants' conspiracy substantially affected South Dakota commerce;

C. During the Conspiracy Period, Nokia conducted a substantial volume of business in South Dakota. Nokia sold LCD Products to retailers and/or other customers in South Dakota. As a result of its presence in South Dakota and the substantial business it conducts in South Dakota, Nokia is entitled to the protection of the laws of South Dakota; and

D. As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and

LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under South Dakota Rev. Code Ann. §§ 37-1-3.1 *et seq.*

191. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*

    A.    Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Tennessee and fixed, raised, maintained, and stabilized LCD prices in Tennessee at artificially high, non-competitive levels;

    B.    As a result, Defendants' conspiracy substantially affected Tennessee commerce;

    C.    During the Conspiracy Period, Nokia conducted a substantial volume of business in Tennessee. Nokia sold LCD Products to retailers and/or other customers in Tennessee. As a result of its presence in Tennessee and the substantial business it conducts in Tennessee, Nokia is entitled to the protection of the laws of Tennessee; and

    D.    As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Tennessee Code Ann. §§ 47-25-101 *et seq.*

192. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. tit. 9, §§ 2451 *et seq.*

    A.    Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Vermont and fixed, raised, maintained, and stabilized LCD prices in Vermont at artificially high, non-competitive levels;

    B.    As a result, Defendants' conspiracy substantially affected Vermont commerce;

    C.    During the Conspiracy Period, Nokia conducted a substantial volume of business in Vermont. Nokia sold LCD Products to retailers and/or other

1   customers in Vermont. As a result of its presence in Vermont and the

2   substantial business it conducts in Vermont, Nokia is entitled to the protection

3   of the laws of Vermont; and

4   D.   As a direct and proximate result of Defendants' conduct, Nokia has been

5   injured in its business and property by paying more for LCD Products and

6   LCDs purchased from Defendants, their co-conspirators, and others than it

7   would have paid in the absence of Defendants' combination and conspiracy,

8   and is entitled to relief under Vermont Stat. Ann. tit. 9, §§ 2451 *et seq.*

9   193.   By reason of the foregoing, Defendants have entered into agreements in restraint of

10  trade in violation of West Virginia Code Ann. §§ 47-18-1 *et seq.*

11  A.   Defendants' conspiracy restrained, suppressed, and/or eliminated competition

12  in the sale of LCDs in West Virginia and fixed, raised, maintained, and

13  stabilized LCD prices in West Virginia at artificially high, non-competitive

14  levels;

15  B.   As a result, Defendants' conspiracy substantially affected West Virginia

16  commerce;

17  C.   During the Conspiracy Period, Nokia conducted a substantial volume of

18  business in West Virginia. Nokia sold LCD Products to retailers and/or other

19  customers in West Virginia. As a result of its presence in West Virginia and

20  the substantial business it conducts in West Virginia, Nokia is entitled to the

21  protection of the laws of West Virginia; and

22  D.   As a direct and proximate result of Defendants' conduct, Nokia has been

23  injured in its business and property by paying more for LCD Products and

24  LCDs purchased from Defendants, their co-conspirators, and others than it

25  would have paid in the absence of Defendants' combination and conspiracy,

26  and is entitled to relief under West Virginia Code Ann. §§ 47-18-1 *et seq.*

27  194.   By reason of the foregoing, Defendants have entered into agreements in

28  restraint of trade in violation of Wisconsin Stat. Ann. §§ 133.01 *et seq.*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF     53

A.    Defendants' conspiracy restrained, suppressed, and/or eliminated competition in the sale of LCDs in Wisconsin and fixed, raised, maintained, and stabilized LCD prices in Wisconsin at artificially high, non-competitive levels;

B.    As a result, Defendants' conspiracy substantially affected Wisconsin commerce and had impacts within the State of Wisconsin;

C.    During the Conspiracy Period, Nokia conducted a substantial volume of business in Wisconsin. Nokia sold LCD Products to retailers and/or other customers in Wisconsin. As a result of its presence in Wisconsin and the substantial business it conducts in Wisconsin, Nokia is entitled to the protection of the laws of Wisconsin; and

D.    As a direct and proximate result of Defendants' conduct, Nokia has been injured in its business and property by paying more for LCD Products and LCDs purchased from Defendants, their co-conspirators, and others than it would have paid in the absence of Defendants' combination and conspiracy, and is entitled to relief under Wisconsin Stat. Ann. §§ 133.01 *et seq.*

## K.    PRAYER FOR RELIEF

WHEREFORE, Nokia requests:

A.    That Defendants' unlawful agreement, conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed to be:

i.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in the First Claim for Relief; and

ii.    An unreasonable restraint of trade or commerce in violation of the Cartwright Act, California Bus. & Prof. Code §§ 16700 *et seq.*, as alleged in the Second Claim for relief; and

iii.    In the alternative, an unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition laws of Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska,

1   Nevada, New Mexico, New York, North Carolina, North Dakota, South
2   Dakota, Tennessee, Vermont, West Virginia, and Wisconsin as alleged in the
3   Third Claim for relief.

4   B.    That Nokia recover damages, as provided by federal and state antitrust laws, and that a
5   judgment be entered in favor of Nokia against Defendants, jointly and severally, in an amount to be
6   trebled in accordance with such laws;

7   C.    That Nokia obtain any penalties, punitive or exemplary damages, and/or full
8   consideration, where the laws of the respective states identified herein so permit;

9   D.    That Nokia recover damages and/or all other available monetary and equitable
10  remedies under the state unfair competition laws identified above;

11  E.    That Defendants, their affiliates, successors, transferees, assignees, and the officers,
12  directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on
13  their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or
14  renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any
15  other conspiracy or combination having a similar purpose or effect, and from adopting or following
16  any practice, plan, program, or device having a similar purpose or effect;

17  F.    That Nokia be awarded pre- and post-judgment interest, and that such interest be
18  awarded at the highest legal rate from and after the date of service of the Complaint in this action;

19  G.    That Nokia recover its costs and disbursements of this suit, including reasonable
20  attorneys' fees as provided by law; and

21  H.    That Nokia be awarded such other, further, and different relief as the case may require
22  and the Court may deem just and proper under the circumstances.

24  [SEE SIGNATURE ON NEXT PAGE]

1   Date: November 25, 2009.

2   Respectfully submitted,

3

4

5

6

7

8   Randall L. Allen (randall.allen@alston.com)
    California Bar No. 264067
9   **ALSTON + BIRD LLP**
    Two Palo Alto Square
10  3000 El Camino Real, Suite 400
    Palo Alto, California 94306
11  Telephone: 650-838-2000
    Facsimile: 650-838-2001

12  Peter Kontio (peter.kontio@alston.com)
13  *Pending Pro Hac Vice Admission*
    Valarie C. Williams (valarie.williams@alston.com)
14  *Pending Pro Hac Vice Admission*
    B. Parker Miller (parker.miller@alston.com)
15  *Pending Pro Hac Vice Admission*
    **ALSTON + BIRD LLP**
16  One Atlantic Center
    1201 West Peachtree Street
17  Atlanta, Georgia 30309
    Telephone: 404-881-7000
18  Facsimile: 404-881-7777

19
    Richard W. Stimson, Of Counsel (rick.stimson@alston.com)
20  *Pending Pro Hac Vice Admission*
    **ALSTON + BIRD LLP**
21  Chase Tower, Suite 3601
    2200 Ross Avenue
22  Dallas, Texas 75201
    Telephone: 214-922-3400
23  Facsimile: 214-922-3899

24
    Attorneys for Plaintiffs
25  NOKIA CORPORATION and NOKIA INC.

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

3        Plaintiffs Nokia Corporation and Nokia Inc. hereby demand a jury trial for all issues so

4    triable.

5

6    Dated November 25, 2009.

7    Respectfully submitted,

8

9
                                    Randall L. Allen (randall.allen@alston.com)
10                                  California Bar No. 264067
                                    **ALSTON + BIRD LLP**
11                                  Two Palo Alto Square
                                    3000 El Camino Real, Suite 400
12                                  Palo Alto, California 94306
                                    Telephone: 650-838-2000
13                                  Facsimile: 650-838-2001

14                                  Peter Kontio (peter.kontio@alston.com)
                                    *Pending Pro Hac Vice Admission*
15                                  Valarie C. Williams (valarie.williams@alston.com)
                                    *Pending Pro Hac Vice Admission*
16                                  B. Parker Miller (parker.miller@alston.com)
                                    *Pending Pro Hac Vice Admission*
17
                                    **ALSTON + BIRD LLP**
18                                  One Atlantic Center
                                    1201 West Peachtree Street
19                                  Atlanta, Georgia 30309
                                    Telephone: 404-881-7000
20                                  Facsimile: 404-881-7777

21
                                    Richard W. Stimson, Of Counsel (rick.stimson@alston.com)
22                                  *Pending Pro Hac Vice Admission*
                                    **ALSTON + BIRD LLP**
23                                  Chase Tower, Suite 3601
                                    2200 Ross Avenue
24                                  Dallas, Texas 75201
                                    Telephone: 214-922-3400
25                                  Facsimile: 214-922-3899

26
                                    Attorneys for Plaintiffs
27                                  NOKIA CORPORATION and NOKIA INC.

28

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**        57