United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION _____/ | No. M 07-1827 SI MDL No. 1827 |
| This Order Relates To: | No. C 09-05609 SI |
| NOKIA CORPORATION, et al., | **ORDER GRANTING AU OPTRONICS CORPORATION'S MOTION TO COMPEL ARBITRATION** |
| Plaintiffs, | |
| v. | |
| AU OPTRONICS CORPORATION, et al., | |
| Defendants. _____/ | |

On February 18, 2011, the Court heard argument on AU Optronics Corporation's ("AUO") Motion to Compel Arbitration. Having considered the arguments of counsel and the papers submitted, the Court hereby GRANTS AUO's Motion.

**BACKGROUND**

Plaintiff Nokia Corporation, a Finnish company, is a "global leader in the design, manufacture, and supply of mobile wireless handsets." First Amended Complaint ("FAC"), ¶30. Plaintiff Nokia, Inc. is an American subsidiary of Nokia Corporation. FAC, ¶31. On November 25, 2009, Nokia Corporation and Nokia Inc. (collectively, "Nokia") filed suit in this Court against numerous domestic and foreign defendants, including AUO, for violations of state and federal antitrust laws.

Nokia's First Amended Complaint alleges a global price-fixing conspiracy by suppliers of liquid crystal display ("LCD") panels. It alleges that during the conspiracy period (1996-2006), "LCDs used

**United States District Court**
For the Northern District of California

1    in mobile wireless handsets included at least five different types of active and passive matrix

2    technologies: TFT-LCD, thin film diode ('TFD'), color super-twist nematic ('CSTN'), film super-twist

3    nematic ('FSTN'), and monochrome super-twist nematic ('MSTN'). Defendants' and their

4    co-conspirators' price-fixing conspiracy alleged herein had the effect of raising, fixing, maintaining,

5    and/or stabilizing the prices of TFT-LCDs as well as non-TFT LCDs, including TFD, CSTN, FSTN, and

6    MSTN LCDs." FAC, ¶24.

7        Plaintiffs' first claim for relief seeks treble damages and injunctive relief under Section 1 of the

8    Sherman Act, and Sections 4 and 16 of the Clayton Act. The second claim for relief seeks treble

9    damages and injunctive relief under California's Cartwright Act and Unfair Competition Laws, as well

10   as the antitrust, consumer protection, unfair trade and deceptive practices laws of Florida and Nevada.

11   *Id*. Prayer for Relief, ¶A (I-ii).

12       Defendant AUO filed an answer to Nokia's amended complaint on August 27, 2010. Doc. 68.[1]

13   In its answer, AUO asserted a number of affirmative defenses, the fifty-second of which reads, in its

14   entirety, as follows: "To the extent Nokia has agreed to arbitration or chosen a different forum for the

15   resolution of its claims against AUO, its claims are barred and should be dismissed." *Id.* at 37. On

16   January 7, 2011, AUO filed a motion to compel arbitration and stay the court proceedings. Doc. 76.

17

18                                         **LEGAL STANDARD**

19       Section 4 of the Federal Arbitration Act ("FAA") permits "a party aggrieved by the alleged

20   failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition

21   any United States District Court . . . for an order directing that . . . arbitration proceed in the manner

22   provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to

23   comply with a valid arbitration agreement, the district court must issue an order compelling arbitration.

24   *Id.*

25       International commercial arbitration agreements involving a United States corporation are

26   _____

27          [1]    AUO initially filed its answer in the consolidated MDL case, No. 07-1827 but failed to
     file it in the individual case, No. 09-5609. AUO then filed a stipulation that allowed AUO to file the
28   answer in the individual case *nunc pro tunc* to August 27, 2010. Doc. 68. The Court signed an order
     accordingly. Doc. 73.

                                                    2

governed by Chapter 2 of the FAA, which codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention" or "Convention"). 9 U.S.C. § 206. A district court may compel arbitration not only in its own district but also in a foreign location if the proposed arbitration is governed by the Convention. *Id.* Arbitration agreements governed by the New York Convention are also governed by Chapter 1 of the FAA to the extent that the FAA and the Convention are not in conflict. 9 U.S.C. § 208.

The Supreme Court has stated that the FAA espouses a general policy favoring arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008). Federal courts are required to rigorously enforce an agreement to arbitrate. *See Hall Street Assoc.*, 552 U.S. at 582. Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989). The federal policy favoring enforcement of arbitration agreements "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

The Ninth Circuit has held that, in determining whether to issue an order compelling arbitration under the New York Convention, the Court may not review the merits of the dispute but must limit its inquiry to determining whether:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Balen v. Holland America Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009) (citation omitted). "If these questions are answered in the affirmative, a court is required to order arbitration unless the court finds the agreement to be null and void, inoperative, or incapable of being performed." *Prograph Intern. Inc. v. Barhydt*, 928 F. Supp. 983, 988 (N.D. Cal. 1996) (citation omitted); *see also* 9 U.S.C. § 4.

The FAA provides that arbitration agreements generally "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2.  However, the strong presumption in favor of arbitration "does not confer a right to compel arbitration of any dispute at any time."  *Volt*, 489 U.S. at 474.  This is because "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960); *see also McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2d Cir. 1988) (stating that the purpose of the FAA is to "make arbitration agreements as enforceable as other contracts, but not more so") (citation omitted).  Additional grounds for declining to enforce an arbitration agreement include unconscionability and party waiver.  *See Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010) (unconscionability);  *Moses,* 460 U.S. at 24-25 (waiver).

## DISCUSSION

AUO and Nokia entered into a Product Purchase Agreement ("PPA") in 2005.  That PPA included an arbitration clause that reads, in full:

> Any disputes related to this Agreement or its enforcement shall be resolved and settled by arbitration in the English language in London, England, in accordance with the Arbitration Rules of the ICC.  The decision of the arbitrators shall be final, binding, and executable.  The arbitration shall be the exclusive remedy of the Parties to the dispute.

Blumenstein Decl. Ex. A at 16, ¶27.2.  The parties agreed that the PPA would apply "retroactively to previous deliveries."  *Id.* at 15, ¶25.1.  The parties also agreed to a provision stating that "[n]o waiver is effective unless in writing in each separate case and signed by both Parties."  *Id.* at 16, ¶26.2.  At the bottom of each page of the PPA, there is a copyright notice that reserves all rights in the document to Nokia, indicating that Nokia was likely the drafter of the contract.

The parties dispute whether the PPA should be interpreted to govern Nokia's claims and whether AUO has waived any right to demand arbitration.  This Court must consider these issues in light of the specific circumstances of this dispute as well as the federal judiciary's "strong belief in the efficacy of arbitral procedures for the resolution of international commercial disputes[.]"  *Mitsubishi*, 473 U.S. at 631; *see also Moses*, 470 U.S. at 24-25.  As "the party resisting arbitration[, Nokia] bears the burden of proving that the claims at issue are unsuitable for arbitration."  *See Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000).

United States District Court
For the Northern District of California

1

2     **I.      The Arbitration Agreement Governs the Current Dispute**

3           In order to determine whether Nokia's claims are subject to the parties' arbitration agreement,

4     this Court must first evaluate whether the agreement was valid under the Ninth Circuit's four-factor

5     *Balen* test.  If the agreement is found to be valid under the *Balen* test, the Court must then determine

6     whether any other reason exists to find the agreement to be unenforceable.

7

8           **A.      The *Balen* Test**

9           A finding of validity under the *Balen* test requires that four factors be established: (1) a written

10    agreement that (2) includes a provision that requires arbitration in the territory of a signatory of the

11    Convention, (3) arises out of a commercial legal relationship, whether contractual or not, and (4) has

12    an international element, such as a party to the agreement who is not an American citizen, or a

13    commercial relationship with one or more foreign states.  *Balen*, 583 F.3d at 654-55.

14          The parties in this matter do not dispute that the PPA, which is a written and signed agreement,

15    includes an arbitration agreement.  Neither do they dispute that the PPA arose out of their commercial

16    and contractual relationship.  Both parties have international headquarters and American divisions.

17    Therefore, all of the factors are present and the agreement is valid under the *Balen* test.

18

19          **B.      Grounds for Non-Enforcement**

20          Nokia has not asserted any of the more commonly proffered reasons for seeking non-

21    enforcement of an arbitration agreement, such as fraud, duress, or unconscionability.  Instead, Nokia

22    argues that its current claims, which relate to an alleged price-fixing conspiracy, exist wholly apart from

23    the parties' contractual relationship and are thus not governed by the PPA and its arbitration agreement.

24          The reasoning that Nokia offers to support this argument falls short of the "forceful evidence"

25    required, because the broad language of the arbitration clause allows for an interpretation that would

26    cover all claims related, though not integral, to the contractual relationship.  In its complaint, Nokia

27    specifically alleged that "Nokia Corporation contracted with various Defendants regarding the prices

28    and volumes of LCDs that Nokia Corporation and Nokia Inc. purchased in the United States and

1   elsewhere." FAC, ¶32.  This indicates that the claims in this case, which involve allegations of price-

2   fixing, are in fact related to the parties' contractual relationship.

3          Nokia is correct that "a party can only be compelled to arbitrate those claims that it agreed to

4   arbitrate."  Opp. Brief at 15.  The argument that Nokia did not agree to arbitrate the claims currently

5   before the Court, however, is unpersuasive.  The Supreme Court has held in several cases that arbitration

6   clauses are to be read broadly and that any ambiguity must be read in favor of arbitration.  *See e.g. Volt*,

7   489 U.S. at 1974; *see also AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986)

8   ("Finally, it has been established that where the contract contains an arbitration clause, there is a

9   presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not

10  be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of

11  an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage . . .

12  [i]n the absence of any express provision excluding a particular grievance from arbitration, we think

13  only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'")

14  (internal citations omitted).

15         The language of the PPA states that "**any** disputes **related to** this Agreement" must be arbitrated.

16  Blumenstein Decl. Ex. A, 16, ¶27.2 (emphasis added).  This is similar to the language analyzed by the

17  Ninth Circuit in *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999).  In *Simula*, the two parties

18  entered into a contractual relationship in which Simula was to provide Autoliv with certain car parts that

19  Autoliv would then deliver to BMW.  *Id.* at 718.  The contract included an arbitration clause that stated

20  that it would apply to "[a]ll disputes arising in connection with this Agreement[.]" *Id.* at 720.  Autoliv

21  then began producing similar car parts that it marketed in direct competition with Simula's products.

22  *Id.* at 718.  Simula brought suit, alleging violations of antitrust, trade secret, trademark, and defamation

23  laws.  *Id.* at 719.  Autoliv moved to compel arbitration under the parties' contract, and Simula objected,

24  arguing that its claims were outside the scope of the agreement.  *Id.*  The Ninth Circuit determined that

25         the language "arising in connection with" reaches every dispute between the parties
            having a significant relationship to the contract and all disputes having their origin or
26          genesis in the contract . . . To require arbitration, [a party's] factual allegations need only
            "touch matters" covered by the contract containing the arbitration clause and all doubts
27          are to be resolved in favor of arbitrability.

28  *Id.* at 721.  The Ninth Circuit therefore ordered the parties to arbitration.  *Id.* at 726.  *See also Chiron*

United States District Court
For the Northern District of California

*Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) ("The record here leaves little doubt that the dispute is subject to arbitration . . . The parties' arbitration clause is broad and far reaching: 'Any dispute, controversy or claim arising out of or **relating to** the validity, construction, enforceability or performance of this Agreement . . . .'") (emphasis added).

Under the Ninth Circuit's reasoning, the language "related to" must be read broadly, to encompass any matter that touches the contractual relationship between the parties. This must include matters that, while not arising directly under the contractual relationship, are nevertheless related to it. Nokia's antitrust claims, while existing outside of the parties' contractual relationship, nevertheless relate to the parties' relationship. *See, e.g.*, FAC, ¶7 ("Defendants'[sic] . . . raised the prices of LCDs and LCD Products above the price that would have prevailed in a competitive market. During the Conspiracy Period, Nokia . . . purchased [LCD-related] Products . . . Nokia suffered damages as a result . . . ."). All of the purchases at issue in this case were made under the PPA. Nokia's current unfair competition and antitrust claims therefore "touch matters" addressed by the agreement and are sufficiently related to be covered under the agreement's broad language. *See JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 172-75 (2d Cir. 2004) (holding that an arbitration clause that read "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration . . . ." was broad enough to encompass plaintiff's collateral antitrust claims).

Nokia offers an alternative interpretation of the holding in *Simula*, namely that in order to find that a dispute "touches matters" addressed by the agreement, it is also necessary to find that some reference to the contract is essential to determining the outcome of the dispute. The Ninth Circuit did note that "resolution here of [the plaintiff's] antitrust claims will necessitate interpreting the 1995 Agreement to determine its meaning and whether the contracts between [the parties] actually do suppress competition as alleged." 175 F.3d at 722. However, the Ninth Circuit mentioned this as one reason supporting the decision to compel arbitration, not as a condition precedent to doing so. The holding in *Simula* does not incorporate this as a necessary component of the "touch matters" test, nor have subsequent courts applying this test required this contractual-interpretation element. *See, e.g. In*

*re Currency Conversion Fee Litigation*, 265 F. Supp. 2d 385, 410 (S.D.N.Y. 2003).[2]  Moreover, the

"touch matters" test was first endorsed by the Supreme Court in *Mitsubishi*.  473 U.S. at 624 n.13.

Nothing in *Mitsubishi*, however, discusses the relevance of contractual interpretation to the

determination of arbitrability.  Therefore, Nokia's current claims are subject to the arbitration clause

contained in the PPA.

Nokia also argues that its claims should be treated as exempt from the arbitration agreement, or

in the alternative that pre-2005 and post-2005 claims should be separated, because at least some portion

of the actions on which Nokia bases its claim for damages took place before Nokia signed the PPA.

AUO, however, contends that the agreement was intended to cover all dealings between the companies,

including those that took place prior to 2005.  Neither party has provided persuasive authority in support

of its position outside of the contract itself.  However, it is true that the PPA includes a term specifically

stating that the agreement as a whole applies retroactively.  Blumenstein Decl. Ex. A, 15, ¶25.1.

Additionally, the PPA included an integration clause stating that the PPA "supersedes all previous

arrangements, communication and agreements between the Parties in relation to the subject matter of

---

[2]     During oral argument, the parties discussed two cases extensively: *In re Currency Conversion Fee Litigation*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003) and *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal. 2002), both of which were cited in AUO's reply.  While it is true that the precise factual allegations of these cases differ from those currently before the Court, their holdings are consistent with this decision.  *Currency Conversion* addressed credit cardholder allegations that credit card networks and banks had conspired to artificially raise the fees for foreign currency conversions performed by credit card companies.  265 F. Supp. 2d at 396-96.  *Bischoff* addressed customer allegations that DirecTV had conspired with other companies to create a monopoly over the "distribution and sale of high-power direct satellite service and equipment."  180 F. Supp. 2d at 1102.  Both cases dealt with the arbitrability of antitrust claims based on the wording of an arbitration clause; both held that, where the parties signed a broadly worded arbitration agreement, the presumption in favor of arbitration compelled a finding that the antitrust claims were arbitrable.  *See, e.g. Currency Conversion*, 265 F. Supp. at 410 ("In contrast, the arbitration clauses at issue here are quite broad in that they apply to any claim 'arising from or relating in any way to . . . your Account' and 'arising out of or relating to . . . your Account.' . . . [A]fter applying the strong policy in favor of arbitration . . . it is clear that plaintiffs' antitrust claims 'touch matters' covered by [the agreements].") (contrasting the arbitration clause before the court with the clause at issue in *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1151 (10th Cir. 1995) in which the Tenth Circuit held that language referring specifically to "the implementation, interpretation, and enforcement of the contract" was not broad enough to cover the parties' antitrust dispute); *see also Bischoff*, 180 F. Supp. 2d at 1106 ("Plaintiffs contend that their claims in this case do not relate to non-performance by DirecTV under the parties' contract, but rather, relate to DirecTV's illegal conspiracies with other parties in an effort to violate anti-trust laws. . . Plaintiffs allege that they have paid higher prices for services and equipment than they otherwise would have but for DirecTV's alleged anti-competitive acts.  These allegations center around DirecTV's services, disputes which clearly fall within the scope of the arbitration clause.").

this Agreement." *Id.* at ¶28.1.

The ultimate question for this Court is whether the parties knowingly entered into an agreement to submit a dispute such as the one presently before the Court to arbitration. Based on the language of the PPA, the answer to that question must be yes. The broad language of the arbitration agreement, combined with the explicit statement that the PPA must be read retroactively, as the final, integrated contract between the parties, indicates that the intent of the parties, at the time of the contract's conclusion, was to submit all disputes relating to the contractual relationship, regardless of whether the actions giving rise to the dispute occurred before or after the signing of the contract, to binding arbitration. This Court is bound to give meaning to the parties' intent as specified in the PPA, regardless of Nokia's present desire to alter the terms of that contract. The fact that Nokia drafted the PPA, as acknowledged by counsel at the hearing and indicated by the copyright notice, further weighs against Nokia's current request for the Court to derogate from the written contents of the contract.

Accordingly, this Court finds that the PPA and its arbitration agreement govern Nokia's present claims against AUO insofar as those claims relate to Nokia's purchases from AUO. Nokia remains free to proceed with its claims against AUO's alleged co-conspirators that are based upon purchases from AUO. It also may proceed with its claims that are based upon purchases from defendants other than AUO.

## II.     AUO Has Not Waived Its Right To Request Arbitration

Nokia also contends that, even if the PPA applies to Nokia's present claims, AUO implicitly waived its right to compel arbitration by engaging in aggressive litigation tactics over a fourteen month period. AUO responds that its actions have not been inconsistent with its intent to arbitrate, that Nokia has failed to demonstrate that it would suffer any prejudice if the parties were sent to arbitration, and that the PPA requires any waiver to be in writing.

The Ninth Circuit has established a three part test, called the *Fisher* test, for determining whether a party has waived its right to compel arbitration: "A party seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from

United States District Court
For the Northern District of California

such inconsistent acts." *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir.1986). "However, waiver of the right to arbitration is disfavored because it is a contractual right, and thus any party arguing waiver of arbitration bears a heavy burden of proof." *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758 (9th Cir. 1989) (citation omitted).

### A.    Awareness of the Existence of the Arbitration Clause

Nokia argues that AUO must have been aware of the existence of the arbitration clause.   AUO has not challenged this assertion, and therefore, the Court finds that the first prong of the test is satisfied.

### B.    Actions Inconsistent With an Intent to Arbitrate

Nokia argues that AUO has delayed moving to compel arbitration and chosen instead to participate in the litigation process.  Nokia contends that this decision was inconsistent with AUO's right to arbitrate and thereby qualifies as an implicit waiver of that right.   Additionally, Nokia argues that AUO's decisions to join the other defendants' motion to dismiss, file an answer to Nokia's complaint, participate in discovery, and take part in the meet-and-confer process were inconsistent with AUO's right to compel arbitration.

The Ninth Circuit has held that a significant delay may indicate an intent to waive arbitration rights.  *Van Ness*, 862 F.2d at 758.  In *Van Ness*, the party seeking to compel arbitration delayed over two years before moving to compel arbitration.  *Id.*  Its motion to compel arbitration was filed after the trial had initially been scheduled to begin, and only three months prior to the continued start date.  *Id.* at 755.  The court held that this delay constituted an implicit waiver of the right to compel arbitration. *Id.*

The case presently before the Court is distinguishable on several levels.  First, the delay between Nokia's initial filing and AUO's motion to compel is just over one year, as opposed to the two years found unacceptable in *Van Ness.*  Second, the trial is currently scheduled to begin on November 5, 2012. *See* No. 07-1827 (MDL Docket), Doc. 2165.  This start date was almost two years away when AUO filed its motion to compel, and is still well over a year away as of this decision.  Third, while AUO has participated in various aspects of the litigation, this involvement cannot reasonably be compared to the

United States District Court
For the Northern District of California

involvement in *Van Ness.* The defendant in Van Ness, one of a small group of defendants, apparently chose of its own accord to move forward with litigation. *Van Ness*, 862 F.2d at 755-56. In the present case, by contrast, AUO is one of numerous defendants, and Nokia is one of numerous plaintiffs, in a complex multidistrict litigation. The motion to dismiss was not filed by AUO itself; while AUO chose to join the motion, it can hardly be considered the equivalent to filing such a motion independently. Moreover, the Ninth Circuit has held that even where a party files a motion to dismiss, this alone will not be sufficient to constitute a waiver of the right to compel arbitration. *See Sovak v. Chugai Pharmaceutical Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002). The same is true of each of AUO's actions; while they might not be wholly consistent with an intent to arbitrate, neither are they inherently inconsistent with that right, without an additional showing of prejudice to Nokia.

One of the few actions that can clearly be treated as representing AUO's intent is AUO's answer to Nokia's amended complaint. Doc. 68. While AUO did not affirmatively demand arbitration in its answer, it did assert that "[t]o the extent Nokia has agreed to arbitration or chosen a different forum for the resolution of its claims against AUO, its claims are barred and should be dismissed." Answer, Doc. 68 at 37. Moreover, the existence of a written waiver requirement in the PPA weighs against a finding of implicit waiver. AUO did not at any point explicitly waive its right to compel arbitration, whereas the reference to arbitration in its answer could be interpreted as an intent to preserve its right. Ultimately, the fact that this is one of a very complex set of cases further cautions the Court against reading too much into AUO's actions, especially in light of the policy disfavoring waiver. Therefore, while the second prong of the *Fisher* test is less clear, it appears to weigh against a finding of waiver.

### C.    Prejudice to the Non-Moving Party

Nokia claims that it has been prejudiced by AUO's actions in at least three specific ways. First, Nokia claims that it has been forced to respond to multiple legal challenges from AUO, including the aforementioned motion to dismiss and several discovery-based motions. Second, Nokia claims that it has been forced to invest significant time and money in pursuing discovery with regard to AUO and that this investment will be for nothing if Nokia is forced to arbitrate, due to different standards relating to discovery in arbitrations. And third, Nokia argues that it has also incurred significant expenses

responding to AUO's discovery requests, and that Nokia's prejudice here is amplified because AUO likely would not have been able to insist on such expansive discovery in an arbitration setting.

The Ninth Circuit has strongly indicated that where there is no showing of prejudice, there will likely be no waiver of arbitration rights. *See Sovak*, 280 F.3d at 1270 ("We conclude that Sovak has not met his burden because he has not shown how he was prejudiced by Cook's delay in moving to compel arbitration."). In the present case, two facts weigh heavily against a finding of prejudice. First, AUO is only one of numerous defendants against which Nokia has brought suit in this proceeding. Therefore, even had AUO moved to compel arbitration immediately after Nokia filed its complaint, Nokia would likely still have been required to answer the motion to dismiss, comply with discovery requests, and otherwise engage in this litigation. The discovery between Nokia and AUO, it is true, might not have taken place or would have been less extensive had an arbitral proceeding been initiated sooner. However, Nokia may be able to use some of the information is has obtained in the arbitration as well as in its ongoing lawsuits with other defendants on this same issue. Transfer to an arbitral forum will not preclude Nokia from pursuing its claims and Nokia is free to raise these equitable concerns before the arbitrator, who will be in a better position to discern the factual outlines of the discovery dispute.

The parties to this matter are both sophisticated corporations. The arbitration agreement is part of a complex business contract that appears to have been drafted by Nokia. The evidence before the Court does not clearly indicate an intent to waive the right to arbitrate on AUO's part, or significant prejudice on Nokia's; neither does it convey a clear intent to exclude anti-trust or unfair business practice from the scope of the arbitration clause. As the party challenging the motion to compel arbitration, Nokia carries the heavy burden of proving to the Court that an otherwise enforceable arbitration agreement should not apply to the case at hand, and it must do so in light of the strong federal policy in favor of enforcing arbitration agreements, particularly in the field of international commercial disputes. Nokia has failed to carry that burden.

### III. The Litigation Between Nokia and AUO Is Stayed Pending Arbitration

It is within the Court's discretion to stay all or part of the litigation associated with the dispute between Nokia and AUO. *United States v. Neumann Caribbean Int'l, Ltd.*, 750 F.2d 1422, 1427 (9th

Cir. 1985); *see also Bischoff*, 180 F. Supp. 2d at 1114.  Alternately, the Court may allow the litigation to run concurrently with arbitral proceedings.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985).  In light of the many parties associated with this multidistrict litigation, as well as the significant amount of time between now and the scheduled trial date, the Court stays all litigation between Nokia and AUO that involves purchases made by Nokia from AUO.  Nokia remains free to pursue litigation with the other alleged co-conspirators.

### IV.      Modification of the Protective Order

At the February 18, 2011 hearing on this matter, the parties discussed the possibility of amending the protective order that currently prevents the parties from revealing the details of this multidistrict litigation, in order to allow them to present certain evidence obtained in this litigation to the arbitrator. The Court is amenable to this possibility and requests that the parties meet and confer and present the Court with a proposed order.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant AUO's Motion to Compel Arbitration.  Doc. 76, 78 in 09-5609; Doc. 2283 in 07-1827.

**IT IS SO ORDERED.**

Dated: July 6, 2011

_____
SUSAN ILLSTON
United States District Judge